Thomas TANG, Plaintiff-Respondent,

v.

C.A.R.S. PROTECTION PLUS, INC.,
Defendant-Appellant.

Court of Appeals

*No. 2006AP1540. Submitted on briefs February 27, 2007.
—Decided April 3, 2007.*

2007 WI App 134

(Also reported in 734 N.W.2d 169.)

753

754

756

On behalf of the defendant-appellant, the cause was submitted on the briefs of *William E. Hughes, Jennifer J. Kopp* and *Theresa E. Essig* of *Whyte Hirschboeck Dudek S.C.*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Mitchell J. Barrock* of *Barrock & Barrock* of Brookfield.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. CURLEY, J. C.A.R.S. Protection Plus, Inc. (CARS) appeals from the judgment entered in favor of Thomas Tang, determining that CARS breached its

contract with Tang and awarding Tang attorney's fees under the Magnuson-Moss Warranty Act (Magnuson-Moss Act or the act). CARS contends that the trial court erred in concluding that it breached the contract because the trial court's factual findings regarding Tang's and O'Reilly Motors's (O'Reilly) communications with CARS were clearly erroneous, and because the trial court erred in finding that under the terms of the contract, CARS was not allowed to demand a determination of "cause" of a car part's failure at the car owner's expense before CARS had to pay out on its warranty. CARS instead claims that Tang failed to fulfill his obligations under the warranty. CARS also contends that the trial court erred in awarding Tang attorney's fees under the Magnuson-Moss Act, claiming that the act was not violated and that the act does not apply because the contract was a service contract rather than a warranty.[1] Tang asserts that the trial court's conclusions were proper and asks this court to grant him attorney's fees for this appeal under the Magnuson-Moss Act and moves for frivolous costs.

¶ 2. We are satisfied that the trial court's factual findings regarding the number of contacts that Tang and O'Reilly had with CARS were not clearly erroneous and that the trial court properly interpreted the contract. Therefore, we conclude that CARS breached the contract and the implied covenant of good faith. We further determine that the contract was a service contract, that the trial court properly concluded that Tang established a claim under the Magnuson-Moss Act, and we remand to the trial court for a determina-

---

[1] Because the contract between Tang and CARS was entitled "warranty," we use the term warranty to refer to the contract; however, as explained in section C. of this opinion, the contract is in reality a service contract and not a warranty.

tion of whether attorney's fees for this appeal are appropriate under the Magnuson-Moss Act. Finally, we deny Tang's motion for frivolous costs. Accordingly, we affirm the judgment, but remand for a determination of whether Tang is entitled to attorney's fees for this appeal under the Magnuson-Moss Act.

## I. BACKGROUND.

¶ 3. On January 16, 2004, Tang purchased a used 1999 Jaguar XJR on the internet auction site eBay from WFL Wholesale (WFL) for $19,850. Prior to purchasing the car, Tang had inquired from WFL about purchasing a warranty and WFL referred Tang to CARS, a company that specializes in issuing car warranties. Tang purchased a "Value Plus Limited Warranty" (the contract) for thirty-six months from CARS for $1,499. The warranty was accepted and approved by CARS on January 30, 2004.

¶ 4. The contract sets forth a list of "covered components," which includes, under the heading "engine," in part: "All internally lubricated parts: Engine block, cylinder head(s), intake manifold, pistons, piston rings . . . ." The warranty also set forth a "warranty claim procedure" which provides in part:

> Your vehicle must be at a repair center in order for a claim to be opened. Once the vehicle is at the repair center call CARS Protection Plus, Inc. at 1–800–335–6838 with the estimate of repairs before any work begins. The limited warranty holder is responsible for the charges relating to the tear down and diagnosis of the vehicle. If it is determined that the covered component has failed and the estimate for the repair is agreed upon by our adjuster, an authorization number will be issued for the repair. . . . No invoices will be processed for reimbursement without a valid

761

authorization number. Repairs can be done at any qualified repair shop you choose, however, CARS Protection Plus, Inc. reserves the right to have repairs done at a location other than the one you have selected. When making the repairs, the repair shop shall use components of the same type and quality as those removed. Replacement parts may include new, rebuilt or used components. When having maintenance done on your vehicle you must retain all copies of work performed. We reserve the right to request any and all maintenance records pertaining to your vehicle.

¶ 5. In March 2004, Tang began to notice problems with the car's engine and took it to Wilde Jaguar (Wilde), a Jaguar dealership. The mechanics at Wilde inspected the car and informed Tang that there was low compression in one cylinder and that the engine would have to be replaced. On March 5, 2004, Bill Heaney of Wilde contacted Richard Hardy, the claims adjuster at CARS assigned to Tang, and informed Hardy of what the mechanics had concluded. Hardy informed Heaney that CARS would not pay for the repair unless it knew what triggered the problem, that a tear-down of the engine was necessary to make that determination, and that Tang would be responsible for the cost of the tear-down and diagnosis. After Tang experienced some difficulties contacting Hardy, CARS provided him with an alternative telephone number where he eventually reached Hardy. According to Tang, Hardy told him that CARS would not cover the repair unless a tear-down of the engine was performed at Tang's expense, because CARS needed to know the "cause" of the damage. CARS denies that Tang contacted Hardy and that an alternative number was given.

762

¶ 6. Hoping to avoid the tear-down, Tang took the car to another auto repair center, F&F Tire (F&F), for another evaluation. The mechanics at F&F reached the same conclusion as those at Wilde: a leak in one cylinder led to low compression in that cylinder and the engine needed to be replaced. F&F referred Tang to O'Reilly, which specializes in engines like the one in Tang's Jaguar.

¶ 7. Consistent with the previous two analyses, the mechanics at O'Reilly also concluded that there was a defect in a cylinder, specifically scoring on the cylinder caused by broken piston rings, and that the engine needed to be replaced. On March 22, 2004, Kelly Kotecki, Tang's service writer at O'Reilly, contacted Hardy and informed Hardy that Tang's car needed a new engine. Hardy told Kotecki that CARS needed more information before the engine replacement could be covered and that the engine had to be dismantled to determine what component had caused the failure. Kotecki disagreed that such a tear-down was necessary because it was clear that the piston rings, a covered component, had failed and that the engine needed to be replaced. Hardy refused to authorize the repair unless a further tear-down was performed at Tang's expense, and advised Kotecki to obtain authorization from Tang. According to Kotecki's testimony, he believed Hardy's demands were atypical because warranty claims generally require only a determination of what component failed, not the cause of the failure.

¶ 8. Kotecki and Tang discussed Hardy's demand for a tear-down. According to Tang, he spoke with Hardy, disputing the need for further tear-down, but Hardy told him it was needed. CARS denies this conversation ever took place. Tang authorized the tear-down because he felt he had no other choice. O'Reilly

performed a tear-down of the engine, which again confirmed that the damaged piston rings had scored the cylinder walls. According to Kotecki, he contacted Hardy on March 25, 2004, and informed him that the tear-down had confirmed the original diagnosis, but Hardy refused to authorize the repair, requested further tear-down of the engine, and demanded that the engine be removed from the car so an adjustor from CARS could be sent to examine it.[2] According to CARS, the conversation never took place, and CARS specifically disputes that it ever promised to send an inspector. O'Reilly further dismantled the engine in anticipation of an inspector. An inspector never arrived to inspect the engine.

¶ 9. Around April 13, 2004, Kotecki informed Tang that an inspector had never arrived, that the car could no longer sit in the shop, but that because they knew that the reason for the problem was the failure of a covered component—broken piston rings that had scored a cylinder—the repair should be covered by the warranty. As a result, Kotecki searched for a used engine, but, finding none, Tang ultimately authorized O'Reilly to order a new engine. Kotecki had not yet received authorization from CARS, but started making arrangements to install the new engine because he felt there was no reason why the repair would not be authorized.

¶ 10. The new engine arrived on April 20, 2004. On April 29, 2004, Kotecki spoke with Hardy and told him that O'Reilly had finished the tear-down of the

---

[2] According to Kotecki, such inspections are typical when the cost of the repair exceeds $1000, and since the cost of replacing the engine in this case was estimated as being between $15,000 and $16,000, such a request was not unexpected.

engine, had received the replacement engine, and was waiting for an adjustor from CARS to arrive. Whether the engine had already been installed at this time is in dispute: Kotecki states it had not; CARS maintains that Kotecki told Hardy that it had. It is, however, undisputed that Hardy informed Kotecki that CARS was not sending out an inspector, CARS was not going to authorize the claim, and the claim would have to be sent for review, for which CARS needed a copy of the final bill. According to Kotecki, when he told Hardy that O'Reilly had the replacement engine on hand, Hardy stopped dealing with him. According to CARS, an authorization number was never issued because it was unable to determine the cause and extent of the damage or whether the engine needed to be replaced. Based on his conversation with Hardy, Kotecki still had the impression that CARS would cover the repair because the failed component was covered and because Hardy had told him that in order to proceed with the claim he needed a copy of the final bill, which could be produced only once all the work was done. According to Kotecki and Tang, at the end of April Tang approved the installation of the new engine, and at the beginning of May O'Reilly completed the installation. The cost of the repair was $13,733.26.

¶ 11. Soon thereafter, Kotecki spoke with Hardy and Hardy informed Kotecki that since Tang had authorized the repair without an authorization number, he had failed to follow the appropriate claim procedures and CARS would deny the claim.

¶ 12. According to Tang, between finding out that CARS refused to cover the repair and the time he picked up his car on May 5, 2004, he attempted multiple times to contact Hardy, but his calls went unanswered. CARS claims that its telephone records indicate that there

were no unanswered calls to CARS from Tang. On May 5, 2004, Tang spoke with Hardy and disputed the denial of the claim. Hardy responded that CARS no longer had any responsibility to Tang because he had not followed CARS's procedure and had authorized the repair without authorization from CARS. Tang was forced to pay the entire $13,733.26 cost of the repair himself.

¶ 13. On June 23, 2004, Tang filed this lawsuit against CARS alleging, as relevant, breach of contract and breach of implied warranties. CARS filed an answer and subsequently a motion for summary judgment. The motion was denied. At the final pretrial on May 11, 2005, Tang moved to amend the complaint to add a claim under the Magnuson-Moss Act, 15 U.S.C. §§ 2301–2312. The court allowed the parties to brief the issue and, on June 16, 2005, granted Tang's motion. The case was tried to the court.

¶ 14. The trial court issued its findings of fact and conclusions of law on February 13, 2006. The court first noted that there were three major factual issues: (1) the extent of the verbal contact between Kotecki and Hardy between March 22 and April 29, 2004; (2) whether Hardy indicated that he would send someone to inspect the vehicle; and (3) whether the engine had been installed when Kotecki and Hardy spoke on April 29 or whether the engine was sitting nearby, ready to be installed. The court found Tang's version more credible, concluding that there was no "documentary evidence that other contacts did not occur" between Kotecki and Hardy between March 22, and April 29, 2004, and found it to be "considerably more likely than not that Hardy gave some indication that he was going to send [an inspector] out." Having resolved the first two issues in favor of Tang, the court deemed it unnecessary to address the third and noted that "if [the engine] was

installed, it was only because efforts were made to contact Hardy and Hardy did not respond."

¶ 15. The court noted that the disputed language in the contract was the sentence "[t]he limited warranty holder is responsible for all charges relating to the tear down and diagnosis of the vehicle," specifically the meaning of the word "diagnosis," which the court found ambiguous. Using the dictionary definition, the court ultimately agreed with Tang that the contract requires only that the car owner pay for the investigation to determine whether a covered part has failed, and does not give CARS the right to require a car owner to pay for an investigation to determine what caused that part to fail. The court noted that this interpretation was supported by the immediately following sentence—"If it is determined that the covered component has failed and that the estimate for the repairs is agreed upon by the adjustor, an authorization number will be issued . . ."—which suggests that the purpose of the diagnosis is to determine whether a covered component has failed, not why it failed. The court reasoned that because by March 25, 2006, three different mechanics had concluded that covered parts, cylinders and rings, were damaged and that the engine needed to be replaced, CARS was obligated to either approve repairs or inspect the engine at its own expense. Because CARS failed to issue the authorization number or inspect the engine, the court concluded that CARS breached the contract, and the implied covenant of good faith. The court reserved a ruling on the Magnuson-Moss Act claim.

¶ 16. On March 9, 2006, the trial court addressed Tang's claim under the Magnuson-Moss Act, 15 U.S.C. §§ 2301–2312. Tang argued that he was entitled to attorney's fees, while CARS insisted that Tang had

failed to prove a violation of the act. The court determined that "despite the use of the term warranty on the contract," it was not a warranty because it failed to satisfy the definition of a warranty set forth in the Magnuson-Moss Act, 15 U.S.C. § 2301(6), and was instead a service contract. The court then concluded that Tang was nevertheless entitled to attorney's fees because he had satisfied the act.

¶ 17. On March 10, 2006, the trial court entered judgment for Tang, awarding him $13,481.26 in damages for breach of contract, and $11,250.00 in attorney's fees under the Magnuson-Moss Act. This appeal follows. Tang has also filed a motion for costs against CARS for filing a frivolous appeal.

## II. ANALYSIS.

### A. Trial Court's Findings of Fact Regarding the Number of Oral Communications

¶ 18. CARS first contends that the trial court's factual findings regarding the contacts Kotecki and Tang had with Hardy were clearly erroneous.

¶ 19. Findings of fact will not be set aside unless clearly erroneous. WIS. STAT. § 805.17(2) (2005–06).[3] In reviewing findings made by a trial court in a trial to the court, "[i]t is well settled that the weight of the testimony and the credibility of the witnesses are matters peculiarly within the province of the trial court acting as the trier of fact" because the trial court has a superior opportunity "to observe the demeanor of witnesses and to gauge the persuasiveness of their testimony."

___

[3] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

*Kleinstick v. Daleiden*, 71 Wis. 2d 432, 442, 238 N.W.2d 714 (1976) (footnote omitted). It is for the trial court, not the appellate court, to resolve conflicts in the testimony, *see Fuller v. Riedel*, 159 Wis. 2d 323, 332, 464 N.W.2d 97 (Ct. App. 1990), and we review the evidence in the light most favorable to the findings made by the trial court, *see Global Steel Prods. Corp. v. Ecklund Carriers, Inc.*, 2002 WI App 91, 10, 253 Wis. 2d 588, 644 N.W.2d 269. When more than one reasonable inference can be drawn from the credible evidence, this court must accept the inference drawn by the trial court. *Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 644, 340 N.W.2d 575 (Ct. App. 1983). We must search the record for evidence to support the findings that the trial court made, not for findings that the trial court could have made but did not. *Becker v. Zoschke*, 76 Wis. 2d 336, 347, 251 N.W.2d 431 (1977).

¶ 20. On February 13, 2005, in making its factual findings, the trial court stated:

> With respect to the number of contacts between Kotecki and Hardy, I simply find the plaintiff's version more credible. . . . I've considered the motive to lie that each side might have and consider[ed] that slightly favors the plaintiff but not dramatically. But there's one main reason that I find Hardy's account not plausible and that is that I find that diagnostic events that occurred at O'Reilly to be established with reasonable clarity. I don't think they're making these things up. I don't think they went through these steps to – because they wanted to milk money out of Mr. Tang. I think they went through these hoops, so to speak, because Hardy was insisting on them and that notion just doesn't fit with the idea that there was no contact at all between March 22 and April 29.
>
> The notion that they would take the engine apart partially, learn what they already believed and had

already argued with Hardy about and not call him back before they let the car sit around for a week and then did more major surgery, it just doesn't make sense to me. It does make sense if they were calling Hardy and Hardy was saying: No. You need to do more.

¶ 21. As to the contact that Tang and Kotecki had with Hardy, the court was not persuaded by the phone records that CARS submitted and instead, found it credible that there was more than one phone number: "Hardy was a difficult guy to reach. He didn't return phone calls. At some point a different number was given. That testimony sounded credible to me. It didn't sound fabricated." The court then added: "I simply don't find that there is documentary evidence that other contacts did not occur and, therefore, continue to resolve this issue based on what makes sense to me given the diagnostic events that I believe occurred at O'Reilly's."

¶ 22. After discussing the phone call between Kotecki and Hardy on March 22 that both sides agree took place and the subsequent tear-down, the court made the following findings of fact:

> After the engine block was taken a part [sic] . . . Kotecki had additional contact with Mr. Hardy. This would have occurred on or about March 25 . . . . Hardy was not satisfied with the removal of the heads and the other investigation that was done and insisted that the engine be removed and be completely dismantled so that it could be further inspected . . . .
>
> Mr. Kotecki relayed this information to Tang. While I find that between March 5 and March 22 Mr. Tang had had other conversations with Mr. Hardy and/or at least other efforts to contact Mr. Hardy, he did not contact Mr. Hardy or attempt to contact him after March 22. He left that up to Mr. Kotecki. But at this

point, that is, after the conversation that occurred on or about March 25, Mr. Tang again had to decide whether to authorize further tear down at his expense. . . . [T]he choice was relatively easy and he authorized the continued investigation of the engine problem.

Based on that authorization, O'Reilly proceeded to go further and to remove and completely tear down the engine. I find this occurred at some point in late March . . . .

After this complete tear down, Kotecki again contacted Hardy. This could have been either late March of early April and indicated the results of the complete tear down. Strike that last sentence. I'm not going to make that finding, at least not at this point. I do find going back to the March 22 contact or the contact that occurred on or about March 25, that Hardy indicated that CARS wanted to have or might need to have someone inspect the engine on CARS' behalf and Mr. Kotecki indicated that the engine would be available for inspection. This may have been discussed on the March 22 contact as well as the March 25 contact. But it was at least discussed as of the March 25 contact.

No one was sent to inspect the engine by CARS. And by about April 13, O'Reilly's was telling Mr. Tang that the car couldn't just sit around, that something had to be done. O'Reilly was telling Mr. Tang that no inspector had come or was apparently going to come. . . . And given the absence of a contact regarding inspection, O'Reilly's was looking to Tang for some instructions as to what to do.

While it seems very likely that either Tang or Kotecki would have contacted Hardy at this point, there's no specific evidence of such a contact. But I do find that having done the complete tear down, which they were reluctant to do, and before ordering the new engine, possibly at the customer's expense, it is most

771

likely that Kotecki did contact Hardy to report the results of the final tear down or made some effort to do that which Mr. Hardy didn't respond to.

On or about April 14, O'Reilly's ordered a new engine . . . .

On April 29 Kotecki and Hardy had another conversation. While I found it likely that there were additional conversations after the complete tear down, I also found that it may simply have been that there was an effort at contact that was not responded to by Mr. Hardy. So this was at least their third contact and perhaps a fourth or fifth contact.

¶ 23. CARS submits that these factual findings by the trial court, specifically regarding contact that Tang and Kotecki had with Hardy, were clearly erroneous: "that Tang attempted to contact Hardy numerous times between March 5[,] and March 22, 2004," "that Kotecki contacted CARS on March 25, 2004 and again in late March or early April to advise CARS with regard to the tear down and discuss what the investigation revealed," but "that Hardy simply failed to respond to these contacts." CARS insists that during the time Tang's Jaguar was at O'Reilly, only two communications took place, and that those were between Hardy and Kotecki on March 22, and April 29, 2004. CARS again relies on its telephone records, which it alleges reflect that Hardy spoke with Kotecki on only those two dates.

¶ 24. We cannot agree with CARS that the trial court's factual findings were clearly erroneous. CARS focuses almost exclusively on the phone records it submitted as proof of what contacts did or did not take place. However, as the trial court noted, the issue was

really one of credibility because both sides presented contradictory versions of what took place. CARS discounts Tang's and Kotecki's testimony that many of their calls were made to Hardy's "alternative" or "personal" number as "self-serving and unsupported testimony" about "a number that would conveniently not show up on any of the telephone records produced by CARS," and insists that there is no "documentary evidence" to support their testimony and the existence of an alternative number which was not mentioned until trial. It is, however, unclear why Kotecki's testimony would be self-serving as he was merely trying to serve a customer, and CARS does not explain what motive Kotecki would have had to fabricate testimony about Tang's car and his dealings with Tang. CARS, by contrast, certainly had a reason to offer less than truthful testimony regarding its communications with Kotecki and Tang in its quest to show that it was not obligated to cover Tang's repair. The court's central conclusion was that the delays at O'Reilly made sense only when considered in connection with conversations Kotecki must have had with Hardy. This conclusion is reasonable. CARS makes no effort to respond to this conclusion. Moreover, as Tang aptly points out, CARS never offered telephone records from Hardy's mobile phone or other personal telephone number into evidence to disprove the notion that calls had been made to another number.

¶ 25. Finally, CARS also asserts that the trial court applied the incorrect burden of proof because its decision was based in part on its conclusion that there was no documentary evidence to prove that the additional contacts did not occur, rather than on evidence presented by Tang that they did occur. We are also not convinced by this argument. CARS presumably refers

773

to the sentence, "I simply don't find that there is documentary evidence that other contacts did not occur and, therefore, continue to resolve this issue based on what makes sense to me given the diagnostic events that I believe occurred at O'Reilly's." CARS misreads this sentence, however, as shifting the burden to it to prove a lack of evidence. Read in its entirety, it becomes clear that the trial court was merely reaffirming that it would continue to resolve the factual dispute based on "what makes sense" in terms of what took place at O'Reilly, and that the phone records presented by CARS did not change this. The trial court's credibility determinations were not clearly erroneous.

## B. Interpretation of Contract

¶ 26. CARS next contends that the trial court erroneously determined that it was not allowed, under the terms of the contract, to demand a determination of the cause of a part's failure.

¶ 27. The interpretation of a written contract is a question of law that we review *de novo. Jones v. Jenkins*, 88 Wis. 2d 712, 722, 277 N.W.2d 815 (1979). We review the interpretation of a warranty the way we review any other contract. *Dieter v. Chrysler Corp.*, 2000 WI 45, 15, 234 Wis. 2d 670, 610 N.W.2d 832. Although we review questions of law independently, we benefit from the trial court's analysis. *Northern States Power Co. v. National Gas Co.*, 232 Wis. 2d 541, 545, 606 N.W.2d 613 (Ct. App. 1999).

¶ 28. "[T]he cornerstone of contract construction is to ascertain the true intentions of the parties as expressed by the contractual language." *State ex rel.*

*Journal/Sentinel, Inc. v. Pleva*, 155 Wis. 2d 704, 711, 456 N.W.2d 359 (1990). We "determine what the parties contracted to do as evidenced by the language they saw fit to use." *Id.* "Contract language is considered ambiguous if it is susceptible to more than one reasonable interpretation." *Danbeck v. American Family Mut. Ins. Co.*, 2001 WI 91, 10, 245 Wis. 2d 186, 629 N.W.2d 150. Whether a contract is ambiguous is a question of law we decide independently of the circuit court. *Wausau Underwriters Ins. Co. v. Dane County*, 142 Wis. 2d 315, 322, 417 N.W.2d 914 (Ct. App. 1987).

¶ 29. "When the terms of a contract are plain and unambiguous, we will construe the contract as it stands." *State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, 14, 257 Wis. 2d 421, 651 N.W.2d 345. If the terms of a contract are ambiguous, we must consider extrinsic evidence to arrive at the parties' intent. *Farm Credit Servs. v. Wysocki*, 2001 WI 51, 12, 243 Wis. 2d 305, 627 N.W.2d 444.

¶ 30. We begin by addressing whether the warranty is ambiguous. As noted, the warranty set forth the following procedure for claiming the warranty:

> **WARRANTY CLAIM PROCEDURE** – Your vehicle must be at a repair center in order for a claim to be opened. Once the vehicle is at the repair center call CARS Protection Plus, Inc. at 1-800-335-6838 with the estimate of repairs before any work begins. The limited warranty holder is responsible for the charges relating to the tear down and diagnosis of the vehicle. If it is determined that the covered component has failed and the estimate for the repair is agreed upon by our adjuster, an authorization number will be issued for the repair. . . . No invoices will be processed for reimbursement without a valid authorization number . . . .

¶ 31. CARS contends that the contract is unambiguous. According to CARS, the holder "is responsible for all charges relating to the tear down and diagnosis of the vehicle," and that "if it is determined that the covered component has failed and the estimate for the repairs is agreed upon by [CARS's] adjuster, an authorization number will be issued for the repair," are clear and unambiguous statements which mean that "CARS was entitled to know what caused the alleged problems with the vehicle." Tang agrees with the trial court that the term "diagnosis" is ambiguous, that the word "diagnosis" does not give CARS the right to demand a determination of the cause of a failure, but that "CARS had the right to require Tang to perform only as much investigation as necessary to determine which part in the car had failed."

¶ 32. We conclude that that the contract is ambiguous. In particular, we agree with the trial court that the word "diagnosis" in the sentence "[t]he limited warranty holder is responsible for the charges relating to the tear down and diagnosis of the vehicle," is ambiguous. We are satisfied that CARS's contention that the diagnosis means that the contractual language gives it the right to require a car owner to pay for the investigation necessary to determine what caused a given part to fail, and the trial court's conclusion that the contract requires the owner to perform only the investigation necessary to determine whether a covered part has failed are both reasonable interpretations of the term "diagnosis." *See Danbeck*, 245 Wis. 2d 186, 10.

¶ 33. Having determined that the contract is ambiguous and that the disputed issue is whether the term "diagnosis" allows CARS to demand a determination of

the cause of a given failure at the owner's expense, we must consider extrinsic evidence to arrive at the parties' intent. *Farm Credit Servs.*, 243 Wis. 2d 305, 12. Where a contract is ambiguous and requires a resort to extrinsic evidence to resolve its meaning, the question is one of fact. *Jones*, 88 Wis. 2d at 722.

¶ 34. In an effort to resolve the ambiguity the trial court, first turned to dictionary definitions and discussed the meaning of "diagnosis" as follows:

> I have looked at a couple of different dictionary definitions . . . .
>
> The bottom line is that some of those definitions use the term "cause" some don't. . . . But the definition of "diagnose" that [one dictionary] offer[s] is, first of all, "to recognize as a disease by signs and symptoms." Secondly, ["]to analyze the cause or nature of" in defining the term "diagnosis." In fact, this dictionary actually uses as an example "the diagnosis of engine trouble," and that's a part of definition 3a which reads: "Investigation or analysis of a cause or nature of a condition, situation, or problem."
>
> The part that fails isn't separate from cause here. There's a causal chain one goes through starting with symptoms. When the car comes in, the engine is not running properly. There's all sorts of symptoms. And then the investigation somewhat like a medical investigation proceeds to try to determine what's causing the symptoms.
>
> Usually diagnosis ends with the conclusion about a disease and that may or may not include various levels of cause. Lung cancer is a diagnosis even if the cause of the lung cancer isn't clearly determined. But the lung cancer is the cause of the symptoms that they were investigating. And the same can be said about this matter of parts. We start with the symptoms the car has

and the diagnosis concludes determining the cause of the symptoms. And the important thing to this contract is whether that cause is covered or not, and that's largely determined by reference to components that are covered or not covered.

¶ 35. The trial court then discussed the sentence that immediately follows the sentence discussing diagnosis: "If it is determined that the covered component has failed and that the estimate for the repairs is agreed upon by our adjustor, an authorization number will be issued for the repair." According to the trial court, this sentence "gives the best explanation of this term 'diagnosis,' " and "suggests that the purpose of the diagnosis is to determine whether a covered component has failed."

¶ 36. The court then explained that it felt CARS's argument that it had a right to demand an investigation into the cause of the failure at the car owner's expense was unconvincing because it "has no logical stopping point." The court commented on the testimony of William Mason, a regional manager of CARS:

I asked what would happen if an investigation disclosed that a covered part failed because of the failure of another covered part and whether CARS would then insist that there be further investigation to determine what caused the second covered part to fail. He seemed surprised and said: No we wouldn't do that. I asked why and he simply said: Well, at least my impression was that that would rarely lead to some disclosure of a third part that set this all in motion that wasn't covered. I just didn't understand that. The logic of his apparent interpretation of the contract is that cause can be pursued to whatever degree CARS decides it ought to be pursued, meaning as far as it could be taken to possibly undermine coverage.

In this case based on what I heard, it appears that the engine block and cylinder walls failed because the piston rings failed. If the piston rings were not a covered part, then CARS would avoid coverage. But in this case it appears that they were a covered part and why should CARS' ability under the contract to demand evidence of cause stop at that point? There might be environmental factors that work. There might be misuse at work. The piston ring failure could, I suppose, be caused by some uncovered part and this interpretation of the contract, in my view, clearly asks for too much.

And to interpret the contract to allow for CARS to demand that the owner and holder of the warranty bear that investigative cost is simply absurd.

¶ 37. Based on the meaning of "diagnosis," the next sentence and "[c]ommon sense," the trial court concluded that "it's the holder's responsibility to provide sufficient tear down and diagnosis to determine whether a covered part has failed." The court added that "[o]nce that is done, CARS may be free to pursue other investigation in an effort to disprove coverage but must do that at their expense and must do it promptly and reasonably."

¶ 38. CARS submits that the trial court's conclusion is wrong and that it "was well within its rights to ask for an investigation to determine that a covered component had failed and caused the damage to the vehicle" before approving a repair and explains that it had the right to investigate whether "the alleged damage to the vehicle resulted from driver error or other misuse of the vehicle." We disagree.

¶ 39. We are satisfied that the trial court properly construed the term "diagnosis" by contrasting the terms used in the medical context to how it is used here and by reasoning that a certain problem (lung cancer) is a

diagnosis regardless of whether its cause is determined. The trial court also properly applied the term "diagnosis" in the context in which it appears by considering the immediately following sentence—"If it is determined that the covered component has failed and that the estimate for the repairs is agreed upon by our adjustor, an authorization number will be issued for the repair." The conclusion that this sentence implies that the purpose of the required diagnosis is to determine whether a covered part failed appropriately construed the meaning of the term diagnosis together with the sentence that follows it in a manner that avoids rendering either meaningless. *See Journal/Sentinel,* 155 Wis. 2d at 711 (A contract "should be given a reasonable meaning so that no part of the contract is surplusage.").

¶ 40.　We also agree with the trial court's explanation for why CARS's interpretation would lead to an absurd result without any logical stopping point and that this absurdity is evidenced in the trial court's comments about its questioning of Mason. *See Jones,* 88 Wis. 2d at 722 ("The court cannot redraft the agreement, but must adopt that construction which will result in a reasonable, fair and just contract as opposed to one that is unusual or extraordinary."). These conclusions are also supported by the fact that ambiguities must be construed against CARS because "[a]mbiguous wording will be construed against the drafter provided the contract is also construed as a whole." *See id.* We thus agree with the trial court that the more reasonable interpretation of the contract is that the contract gives CARS the right to require a car owner to pay for the investigation necessary to determine whether a covered part has failed, not what caused a given part to fail.

¶ 41. Having concluded that the contract does not give CARS the right to require a determination of cause at the owner's expense, we finally turn to whether the contract was breached. Whether the facts found by the trial court amount to a breach of contract is a question of law reviewed without deference to the circuit court. *Steele v. Pacesetter Motor Cars, Inc.*, 2003 WI App 242, 10, 267 Wis. 2d 873, 672 N.W.2d 141. A duty of good faith is implied in every contract, and is a guarantee by each party that he or she "will not intentionally and purposely do anything to prevent the other party from carrying out his or her part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Metropolitan Ventures, LLC v. GEA Assocs.*, 2006 WI 71, 35, 291 Wis. 2d 393, 717 N.W.2d 58 (citation omitted). Behaviors recognized as a lack of good faith are: " 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.' " *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 797, 541 N.W.2d 203 (Ct. App. 1995) (citation omitted). Whether a party to a contract has breached its implied duty of good faith is a question of fact. *Wisconsin Natural Gas Co. v. Gabe's Constr. Co.*, 220 Wis. 2d 14, 24 n.6, 582 N.W.2d 118 (Ct. App. 1998).

¶ 42. As noted, the contract sets forth the following "warranty claim procedure" that a holder must follow:

**WARRANTY CLAIM PROCEDURE** – Your vehicle must be at a repair center in order for a claim to be opened. Once the vehicle is at the repair center call

CARS Protection Plus, Inc. at 1–800–335–6838 with the estimate of repairs before any work begins. The limited warranty holder is responsible for the charges relating to the tear down and diagnosis of the vehicle. If it is determined that the covered component has failed and the estimate for the repair is agreed upon by our adjuster, an authorization number will be issued for the repair. . . . No invoices will be processed for reimbursement without a valid authorization number . . . . Repairs can be done at any qualified repair shop you choose, however, CARS Protection Plus, Inc. reserves the right to have repairs done at a location other than the one you have selected. When making the repairs, the repair shop shall use components of the same type and quality as those removed. Replacement parts may include new, rebuilt or used components. When having maintenance done on your vehicle you must retain all copies of work performed. We reserve the right to request any and all maintenance records pertaining to your vehicle.

¶ 43. The trial court concluded that CARS had breached the contract and stated:

Under the terms of the contract I find that at the time the top of the engine block was removed on or about March 25, three different mechanics had concluded that the cylinders and rings were damaged and that the engine needed to be replaced. I find that a covered part, whether it be the engine block or the piston rings, had clearly failed and that at that point CARS was clearly obligated to do one of the following, either approve the repairs or exercise its rights to inspect the engine at its own expense and to determine cause as its sees fit or simply to inspect the engine in order to determine whether alternative repairs were possible or whether a used engine was available. CARS did none of these things and I find that at that point CARS breached the contract and specifically that it breached the implied covenant that it act in good faith.

CARS' insistence on further tear down at the holder's expense was a breach of the contract which deprives them of the right to insist now on some estimate. ... This breach led directly to the absence of an estimate directly to a failure to approve the repairs and damaged Mr. Tang by costing him the benefit of the contract.

¶ 44. CARS submits that the evidence proved that CARS was not given the information it needed to assess Tang's claim. CARS argues:

When Hardy spoke with Kotecki on March 22, 2004, Kotecki simply indicated that there was a 70% leak in cylinders and that he thought there was a problem with the engine. A 70% leak in the cylinders, however, does not automatically mean that the entire engine has to be condemned. No evidence suggested that Kotecki knew what covered component had failed when he spoke with CARS on March 22, 2004 and nothing suggested that Kotecki ever communicated any of his findings to CARS.

Because there was no contact between CARS and Tang or Kotecki between the time the diagnosis was made and the engine was replaced it is undisputed that CARS was never told why a new engine was needed or whether a covered component part failed. CARS was therefore deprived of its right to determine whether new, used or rebuilt parts were available and it was never given an estimate as to the expected cost of repairs.

(Internal references to the record omitted.) CARS instead claims that it was Tang who failed to comply with the proper procedures and committed a material breach.

¶ 45. We again agree with the trial court. CARS's argument fails for several reasons. First, CARS's argument is based on its previous contention that Tang and Kotecki had only two conversations with Hardy— March 22 and April 29, 2004—and we have already

783

rejected CARS's assertion that the trial court's conclusion that more contact took place was clearly erroneous. Thus, for CARS to claim that "because there was no contact between CARS and Tang or Kotecki between the time the diagnosis was made and the engine was replaced it is *undisputed* that CARS was never told why a new engine was needed or whether a covered component part failed" (emphasis added) is wholly misleading and factually incorrect. Not only are the issues of whether CARS was told why a new engine was needed and whether a covered component failed very much in dispute, but these are issues on which the trial court specifically disagreed with CARS.

■■■

¶ 46. Still, under our *de novo* review we must independently determine whether the facts amounted to a breach, *see Steele*, 267 Wis. 2d 873, 10, and we conclude that they do. First, the "vehicle must be at a repair center in order for a claim to be opened." Clearly, Tang's car was at a repair center; in fact, since discovering the problem, Tang's Jaguar was at three different repair centers. Second, "[o]nce the vehicle is at the repair center [the warranty holder or the repair shop must] call CARS Protection Plus, Inc. at 1–800–335–6838 with the estimate of repairs before any work begins." This requirement was satisfied because Kotecki contacted Hardy and informed him what was wrong with Tang's Jaguar before any work began. At this stage "[t]he limited warranty holder is responsible for the charges relating to the tear down and diagnosis of the vehicle," and then "[i]f it is determined that the covered component has failed and the estimate for the repair is agreed upon by our adjuster, an authorization number will be issued for the repair." As we have already concluded, "diagnosis" does not entitle CARS to

demand a determination of the cause of a covered component's failure at the owner's expense, but entitles it to only a determination of whether the failed component is covered. It is undisputed that Tang paid for the tear-down costs as well as all other costs. O'Reilly determined what part failed, yet CARS refused to issue an authorization number for the repair. We are satisfied that this failure by CARS constituted a material breach of the contract.

¶ 47. Indeed, contrary to what CARS would have us believe, it appears as though both Tang and O'Reilly bent over backwards to accommodate Hardy's requests. O'Reilly twice agreed to perform additional tear-down of the engine, specifically to accommodate Hardy's requests, despite being confident that it already knew what the problem was and that the only option was to replace the engine—the same conclusion that had already been reached by two other repair shops. As required by the contract, O'Reilly looked into repairing the engine rather than replacing it, but discovered that, due to the high nickel content in the motor this was not possible and tried to find a used or rebuilt engine, but none was available. In addition, Kotecki explicitly testified that CARS's conduct with respect to Tang's claim was atypical for the industry and that he expected CARS to issue an authorization number after O'Reilly performed the first tear-down of the engine. Tang's and Kotecki's actions were reasonable under the circumstances.

¶ 48. We also conclude that CARS violated the implied covenant of good faith. CARS's behavior in dealing with Tang and Kotecki exhibited an unwillingness to be straight-forward and a failure to promptly perform its end of the bargain. The long delays appear

to be an attempt to get Tang to act in ways that CARS could argue breached the contract and relieved it of any responsibility. Tang purchased a limited warranty hoping to benefit from it should he need it, and when he tried to pursue a claim he faced a lack of cooperation from CARS, hurdles that were not only atypical for the business, but seemingly there to dissuade a car owner from pursuing a claim. This shows a lack of good faith. *See Metropolitan*, 291 Wis. 2d 393, 35.

¶ 49. In light of our conclusion that CARS breached the contract and that Tang acted reasonably in his efforts to assert a legitimate claim, it follows that CARS's claim that Tang breached the contract is without merit.

## C. Magnuson-Moss Warranty Act

¶ 50. Finally, CARS submits that the trial court erred in awarding Tang attorney's fees under the Magnuson-Moss Act.

¶ 51. Under the federal Magnuson-Moss Act, 15 U.S.C. §§ 2301–2312, a consumer may bring a suit against a warrantor in any state for failure to comply with its obligations under a written warranty or implied warranty. *Mayberry v. Volkswagen of Am., Inc.*, 2005 WI 13, 16, 278 Wis. 2d 39, 692 N.W.2d 226. 15 U.S.C. § 2310(d) provides, in pertinent part:

**Civil action by consumer for damages, etc.; jurisdiction; recovery of costs and expenses; cognizable claims**

(1) . . . a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a

> written warranty, implied warranty, or service contract,
> may bring suit for damages and other legal and equi-
> table relief—

If a consumer prevails under § 2310(d)(1), it is within the trial court's discretion whether to allow the consumer to recover costs and fees, including attorney's fees.

> If a consumer finally prevails in any action brought
> under . . . this subsection, he may be allowed by the
> court to recover as part of the judgment a sum equal to
> the aggregate amount of cost and expenses (including
> attorneys' fees based on actual time expended) deter-
> mined by the court to have been reasonably incurred by
> the plaintiff for or in connection with the commence-
> ment and prosecution of such action, unless the court
> in its discretion shall determine that such an award of
> attorneys' fees would be inappropriate.

Sec. 2310(d)(2); *Carl v. Spickler Enters., Ltd.*, 165 Wis. 2d 611, 627, 478 N.W.2d 48 (Ct. App. 1991).

¶ 52. Except where otherwise provided, the Magnuson-Moss Act requires application of state law. *Mayberry*, 278 Wis. 2d 39, ¶ 16 n.9 (citing *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (D.C. Cir. 1986)). State law also governs the appropriate measure of damages for a breach under the Magnuson-Moss Act. 15 U.S.C. §§ 2310(d)(1)(A), 2311(b)(1); *Mayberry*, 278 Wis. 2d 39, ¶ 16 (citing *MacKenzie v. Chrysler Corp.*, 607 F.2d 1162, 1166 (5th Cir. 1979)). We therefore apply Wisconsin law to determine whether the trial court erroneously exercised its discretion in awarding fees. See *Carl*, 165 Wis. 2d at 627. To be sustained, a discretionary determination must be based upon the facts in the record and the applicable law. *Hartung v. Hartung*, 102 Wis. 2d

58, 66, 306 N.W.2d 16 (1981). A discretionary determination must be the product of a rational mental process for the purpose of achieving a determination that a reasonable judge could reach. *Id.* Whether the trial court properly interpreted the act, however, is a question of statutory interpretation. Statutory interpretation is a question of law that we review *de novo. See State v. Stenklyft*, 2005 WI 71, 7, 281 Wis. 2d 484, 697 N.W.2d 769.

¶ 53. We begin by examining whether the contract in question was a warranty or a service contract, as those terms are defined in the Magnuson-Moss Act. 15 U.S.C. § 2301(6) provides:

The term "written warranty" means–

**(A)** any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

**(B)** any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

Section 2301(8) defines the term "service contract" as "a contract in writing to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product."

788

¶ 54. CARS contends that the contract was a service contract. The trial court determined that, despite the use of the term warranty in the contract itself, the contract was a service contract because neither 15 U.S.C. § 2301(6)(a) nor (b) was satisfied. We agree. This contract was not a "promise made in connection with the sale of a consumer product by a supplier to a buyer" and was not a promise "which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free" under § 2301(6)(a). This contract was also not "in connection with the sale" from WFL, but was purchased separately from CARS, albeit around the same time. As the trial court noted, "[i]n a very general sense, Mr. Tang intended that there be a connection to the sale, but there's no evidence to indicate that he couldn't have gone to CARS Protection Plus and bought a warranty for a car that he had owned for years." Rather, this contract is "a contract in writing to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product," § 2301(8), and is thus a service contract. Thus, as the trial court explained, although labeled a warranty, the contract is not in fact a warranty for purposes of the Magnuson-Moss Act.

¶ 55. It appears undisputed that Tang qualifies as a consumer under the act, 15 U.S.C. § 2301(3),[4] and we have already established that Tang was damaged by

---

[4] 15 U.S.C. § 2301(3) reads:

(3) The term "consumer" means a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty

CARS's action and that Tang prevailed. The only disputed issue is hence whether the fact that the contract was a service contract, rather than a warranty, invalidates Tang's claim for attorney's fees under the Magnuson-Moss Act. In other words, can a successful breach of contract claim in state court establish a basis for a claim under the Magnuson-Moss Act and entitle Tang to attorney's fees, even when the contract is a service contract?

¶ 56. In concluding that it could and that Tang thus was entitled to attorney's fees under the Magnuson-Moss Act, the trial court first noted that a "curious thing about the statute" is that "most of the act concerns standards and rules regarding warranties," and that aside from defining a service contract and 15 U.S.C. § 2306, which says only that the commission can prescribe rules about service contracts, the act does not say much about service contracts. The court then noted, in response to CARS's argument that this absence required that there be some violation of a federal law or accompanying regulations in order for fees to be available, that it could make no findings that a violation of a federal rule was required because no such rule or regulation was cited. Referencing Congress's ability to define state court causes of action and remedies, the court then noted that:

> [I]t seems clear that we have accepted the notion that Congress can create State causes of action and can confer remedies that wouldn't otherwise exist. And while the Plaintiff has not proven any specific violation of an obligation under Title 15, Chapter 50 – the

---

(or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).

Magnuson-Moss Act – I find that that is not required under sub. (d) in order to allow for the recovery of attorney's fees.

. . . .

The clear intent of the federal act is to provide remedies including attorney's fees that go beyond the ordinary remedies in a contract case. The clear intent and purpose of that is to provide a degree of consumer protection by punishing service contractors who violate these contracts and presumably provide considerable incentive for them to engage in what Congress considers to be fair play.

¶ 57. CARS disagrees with the trial court's conclusion and submits that the Magnuson-Moss Act imposes fewer obligations on service contractors than warrantors, and that Tang was not entitled to damages because there was no substantive violation of any provision of the Magnuson-Moss Act.

¶ 58. We agree with the trial court's reading of the Magnuson-Moss Act. As noted, the central provision of the Magnuson-Moss Act, 15 U.S.C. § 2310(d), provides:

(1) . . . a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—

¶ 59. If the act was intended to allow a remedy only when a warranty was breached and not when a service contract was breached, it would make no sense for 15 U.S.C. § 2310(d) to explicitly provide that a court may award attorney's fees to "a consumer who is damaged by the failure of a supplier, warrantor, or

*service contractor* to comply with any obligation under this chapter, or under a written warranty, implied warranty, or *service contract"* (emphasis added). Thus, the plain language of § 2310(d) reveals that a breach of a service contract alone does establish a claim.

¶ 60. CARS, however, contends that when 15 U.S.C. § 2310(d) is read in conjunction with other surrounding statutory sections, it becomes apparent that only those more specific sections apply to service contracts; namely, 15 U.S.C. §§ 2306 and 2308(a). Because Tang did not reference these sections, the argument goes, but argued that CARS violated provisions of the Magnuson-Moss Act that impose obligations only on warrantors and suppliers, Tang "misapplied the law." We disagree.

¶ 61. 15 U.S.C. § 2306 provides:

**Service contracts; rules for full, clear and conspicuous disclosure of terms and conditions; addition to or in lieu of written warranty**

(a) The Commission may prescribe by rule the manner and form in which the terms and conditions of service contracts shall be fully, clearly, and conspicuously disclosed.

(b) Nothing in this chapter shall be construed to prevent a supplier or warrantor from entering into a service contract with the consumer in addition to or in lieu of a written warranty if such contract fully, clearly, and conspicuously discloses its terms and conditions in simple and readily understood language.

¶ 62. Clearly, this section provides that the FTC may prescribe rules about service contracts: Subsection (a) gives the FTC authority to prescribe by rule the manner and form in which the terms and conditions of service contracts must be disclosed; and subsection (b)

provides that a supplier or warrantor may sell a service contract on a consumer product in addition to or in lieu of a written warranty as long as the contract discloses its terms and conditions in simple language. Subsection (b) is in fact very similar to 15 U.S.C. § 2302,[5] which imposes disclosure requirements on written warranties. Thus, this section does not in any way limit a consumer's right to sue for a breach of service contract under § 2301(d).

¶ 63. 15 U.S.C. § 2308 provides:

**Implied warranties**

(a) Restrictions on disclaimers or modifications

No supplier may disclaim or modify (except as provided in subsection (b) of this section) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days

---

[5] 15 U.S.C. § 2302 (a) provides, in relevant part:

**Full and conspicuous disclosure of terms and conditions; additional requirements for contents**

In order to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products, any warrantor warranting a consumer product to a consumer by means of a written warranty shall, to the extent required by rules of the Commission, fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty . . . .

The legislative history of 15 U.S.C. § 2306 indicates that the FTC's authority to promulgate disclosure rules for service contracts is coextensive with its authority under 15 U.S.C. § 2302 to promulgate disclosure rules for written warranties. H.R. Rep. No. 1107, 93 Cong., 2d Sess. 39 (1974).

thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.

¶ 64. This section addresses implied warranties and describes restrictions on disclaimers and modifications of such implied warranties. This section does state that a supplier may not disclaim or modify an implied warranty to a consumer at the time of sale or within ninety days, if the supplier enters into a service contract with the consumer. This section is of no assistance, however, with respect to the manner in which 15 U.S.C. § 2310(d) is to be applied to written service contracts already in existence. What CARS means in claiming that 15 U.S.C. §§ 2306 and 2308 "govern service contracts" and that Tang should have alleged a violation of these two sections is unclear.

¶ 65. CARS next claims that Tang is not entitled to damages without establishing a substantive violation of the act and the trial court's application of the law was "illogical" because it allowed Tang to recover damages under the Magnuson-Moss Act even though Tang did not establish a specific violation of an obligation under the act. CARS argues that to establish a violation of the act "Tang must prove either breach of express or implied warranty under State law, or a substantive violation under the terms of the Act itself," and cites *Hines v. Mercedes-Benz USA, LLC*, 358 F. Supp. 2d 1222, 1235 (N.D. Ga. 2005), as support for this proposition. CARS appears to misread *Hines*. The case did not address service contracts and is thus inapplicable.

¶ 66. CARS also claims that "[s]tanding alone a mere breach of a service contract alone falls well short of establishing a claim under the Act" and cites *Saladino v. Team Chevrolet, Inc.*, 611 N.E.2d 583 (Ill.

App. Ct. 2d Dist. 1993), for the proposition that "Illinois courts have recognized that a breach of a service contract is not actionable as a breach of warranty claim under the Magnuson[-]Moss Act." This, however, is not what *Saladino* held. Rather, *Saladino* held that the grant of summary judgment was proper because the contract in question was a service contract, and the complaint had alleged only breach of express and implied warranties, but had failed to allege breach of service contract. *Id.* at 588. CARS's citation to *Saladino* is thus inaccurate and misleading.

¶ 67. We disagree with CARS that Tang had to establish a substantive violation of the act and that the trial court erred in allowing him to recover attorney's fee without doing so. A careful reading of 15 U.S.C. § 2310(d) reveals that the act creates four separate federal causes of action: (1) failure to comply with any obligation under the act; (2) breach of written warranty; (3) breach of implied warranty; and (4) breach of service contract. *See id.*; Barkley Clark & Christopher Smith, *Warranties Under the Magnuson-Moss Act,* 2 LAW OF PROD. WARRANTIES, § 14:12 (2006). Here, the relevant cause of action is breach of service contract. Thus, CARS's assertion that Tang's claim is "illogical" because the trial court concluded that Tang did not establish a specific violation of an obligation under the act is without merit because failure to comply with an obligation under the act is a separate cause of action and not one of relevance here.

¶ 68. Finally, CARS also refers to 15 U.S.C. § 2310(f), which it alleges "unambiguously limits enforcement of a statutory cause of action for breach of warranty against warrantors only." We again disagree.

¶ 69. 15 U.S.C. § 2310(f) reads:

**Warrantors subject to enforcement of remedies.**

For purposes of this section, only the warrantor actually making a written affirmation of fact, promise, or undertaking shall be deemed to have created a written warranty, and any rights arising thereunder may be enforced under this section only against such warrantor and no other person.

¶ 70. We cannot agree with CARS's claim that the fact that only the word "warrantor" is used to describe the person against whom the rights set forth in the act may be enforced implies that it excludes a service contractor. Although the language would admittedly have been clearer had this subsection said "warrantor of service contractor" rather than only "warrantor" in light of 15 U.S.C. § 2310(d), the reading suggested by CARS is not convincing however.

¶ 71. Although, as the trial court noted, the Magnuson-Moss Act is somewhat confusingly written, an examination of the act has reveled that the trial court's conclusion that a breach of a service contract establishes a claim under 15 U.S.C. § 2310(d) was proper. It is simply not logical to conclude that the legislature would first explicitly state in the most central provision, § 2310(d), that the act applies to breaches of service contracts, but in reality not intend for that to be the case, and drop hints in later sections that may be construed as implying that the act was meant to apply to only warranties. Tang prevailed in his suit under the service contract and properly brought a claim for costs and fees under the Magnuson-Moss Act.

¶ 72. As to the attorney's fees, the trial court is free to exercise its discretion, 15 U.S.C. § 2310(d)(2), and we cannot say that it improperly exercised its

discretion on the basis of the facts in this case and the applicable law. Tang also asks this court to award him attorney's fees under the Magnuson-Moss Act for the cost of this appeal. As noted, the determination of whether to award costs and fees under the Magnuson-Moss Act is within the trial court's discretion. *See id.* We therefore remand this issue to the trial court for a determination of whether attorney's fees for this appeal are appropriate, and, if so, in what amount.

¶ 73. Finally, Tang seeks frivolous-appeal costs under WIS. STAT. RULE 809.25(3). Although unsuccessful, as our analysis of CARS's arguments in the previous section indicates, we are satisfied that CARS's appeal is not frivolous. Accordingly, we deny Tang's motion for costs. *See Lenhardt v. Lenhardt*, 2000 WI App 201, 16, 238 Wis. 2d 535, 618 N.W.2d 218 (we may not award fees under RULE 809.25(3) unless the entire appeal is frivolous).

*By the Court.*—Judgment affirmed; cause remanded for further proceedings consistent with this opinion.