COURT OF APPEALS
DECISION
DATED AND FILED

June 11, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2414**

Cir. Ct. No. **2024SC1077**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

TREYTON SETH GOLD AND ARTIE GOLD,

PLAINTIFFS-RESPONDENTS,

V.

NOLAN KOEPP,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Fond du Lac County: ANDREW J. CHRISTENSON, Judge. *Affirmed*.

¶1 GUNDRUM, P.J.[1] Nolan Koepp, pro se, appeals a judgment entered after a court trial. Koepp asserts the circuit court erred when it found he

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

sold Treyton and Artie Gold, both pro se, a motor with an implied warranty of merchantability that did not satisfy the warranty and awarded them $4,420.08. For the following reasons, we affirm.

### Background

¶2     Koepp sold Treyton and his father, Artie, a used boat with a 20-year-old motor on it. After purchasing the boat, Treyton learned that the motor had a hole in it and was thus losing substantial amounts of oil and would not function properly. Treyton and Artie brought this small claims action seeking damages of $4,420.08, the estimated cost to repair the motor. A court trial was held at which the parties presented the following relevant evidence.

¶3     Treyton testified that when he saw Koepp's boat for sale on Facebook Marketplace for $15,000—"which included the boat, the motor, and two single man layout boats"—he pursued the opportunity. Prior to agreeing to purchase the boat and motor, Treyton viewed them twice. The first time, Koepp told Treyton "that the motor had no issues other than blowing a fuse, which he replaced, and only needed a tune-up, which included like the oil, filter, seals, just basic maintenance…. [H]e told me … it had a faulty key switch, but that was a pretty easy repair."

¶4     The second time, Koepp again told Treyton, who was accompanied by Artie, "that the motor had no issues, it just needed the key switch done and just a basic tune-up." Treyton told Koepp "that I did have another motor that I could possibly put on [the boat], assuming that we went through with the sale, I would just put that motor on it to make the boat go faster and then the motor I would get from him I would just resell." That night, Treyton offered Koepp $8,000, which Koepp accepted.

¶5      After picking up the boat, Treyton took it to Riggs Marine to store it for winter and complete a tune-up on the motor. After storing the boat for a couple of weeks, Riggs Marine tuned up the motor and replaced minor items. When "they put oil in it[,] all the oil drained out on the floor…. They asked for permission to further dive into the motor, which we gave them permission." Days later, Riggs Marine told Treyton

> that the motor was pretty much shot and that there was a hole punched through the powerhead that someone had tried to cover up with epoxy, that the epoxy had failed. In addition …, he said that because of the hole being there and that it had failed the motor's pretty much running with no oil and that's why there was also some valves that were chewed up and destroyed.

Riggs Marine informed Treyton that repairing the motor would cost $4,420.08.

¶6      Treyton contacted Koepp. Koepp "said that he had no idea about [the hole] and that he … always had his work done by Skipper's Choice in Green Bay and that we [Treyton and Artie] should call Skipper's Choice and that it wasn't his issue and that he wanted us to not contact him anymore."

¶7      Koepp cross-examined Treyton, asking, "[D]id I not tell you that the boat was using oil and I was adding oil to it on a couple trips?" Treyton responded, "I don't recall you saying that, I just remember you saying that you did an oil change every year …." Responding to questioning by Koepp about "a light or … a beep to the motor when it's low on oil" and Koepp's assertion that he had told Treyton "it was using oil," Treyton stated, "You told me about the beep, but … I'm pretty sure you didn't say anything about … oil." Treyton stated he had been planning to resell the motor "for probably around four-grand."

¶8    Koepp asked Treyton, "[D]id I not say it was [an] as is sale when I sold it to you?" Treyton responded, "When we were talking in person you never said that." Koepp came back with, "Oh, I'm pretty sure every sale in Wisconsin is as is, and I did say that," to which Treyton responded, "I guess I—if you did, I never heard it, and you never said it more than once."

¶9    Artie testified next. Treyton asked his father, "While we were looking at the boat, … did you ever hear [Koepp] say that this was an as is sale?" Artie responded, "No." When Treyton asked, "While we were looking at the boat, did he tell you that the beep was caused from low oil on the motor?" Artie responded, "I didn't hear that." Artie testified that he "heard you guys talking that you could [put a different motor on the boat] because you were talking about the speed, [Koepp] said it was a little slower, slower boat, but that was it." Artie also said he agreed with all of Treyton's testimony.

¶10    On cross-examination, when Koepp asked Artie about "beep driving" related to the motor, Artie stated, "[T]he one thing that I remember is you were telling us about the fuse blown, and you had the kicker, and a client got out and found the fuse was blown …." Koepp then stated, "I did tell you the only time the boat has ever let me down where I had to use the kicker to come in was the time that the fuse blown, otherwise, I've never had [to] use[] the kicker ever on the boat." Artie responded, "I agree with that, the one time the boat failed was … a fuse."

¶11    Koepp was the final witness to testify. He directed the circuit court's attention to page 8 of his answer, which the court stated it had read, related to "the value." That page purports to show the opinions of "J.D. Power Valuation

Services" staff as to the value of the motor: a "Used Trade-In" value of $1,770, an "Average Retail" value of $2,475, and a "High Retail" value of $2,980.

¶12    Koepp also submitted to the court a copy of an email purportedly from his mechanic.  Koepp summarized the email as indicating his mechanic has "never seen an issue.  He installed the motor, he serviced it, he winterized it, he's never done any major maintenance to it, as I was telling them."  This email from the named "[r]etired marine technician," which the court stated it had read, indicated the technician had inspected and tested the engine after it had arrived "on a skid" approximately eight years earlier, and the engine "ran well."  He installed the motor onto Koepp's boat at that time and gave the boat a "sea trial."  The boat "passed our water test," and the technician "sent it on its way."  The technician added that he "saw the boat over the years of service for minor maintenance," and stated, "As far as I know it served [Koepp] well in his guide service."

¶13    Koepp testified that "the motor worked fine for me for eight years and that hole in it that was epox[i]ed was before my time….  I used the boat the last day of duck season.  I didn't sell it hiding anything.  I told them everything I knew about it.  It was all in good faith."

¶14    Apparently referring to the J.D. Power Valuation Services' opinions, Koepp stated,

> Used trade-in was 1,700, average retail is 2,400, and high retail is 29-.  Now, he thinks he would get 4,000 for it, but the dealership—we did tell them that I painted the whole motor gray, so all three dealerships we asked would not take—would not even take it on trade or anything like that because it is painted gray.  So the only person he could really sell the boat to would be another layout hunter.

> … It was burning oil, so I would put that in the used trade-in or lowest, 1,700, but because it's painted gray it's—it would be worth even less than that, like it would be worth $1,000 for parts, what the dealership told me. So when he left my house, because it was painted gray, it was worth 1,000 bucks.
>
> ….
>
> So 1,700, but it was worth parts when it left my house and it's still worth parts now. I was asking 15-, I came down three-grand without the layouts, and he offered me eight, and I said because of the motor, so that's where I was at.

Koepp added, "He … never did spend the four-grand to get the motor fixed…. [H]e's going to have to sell it for parts. It was worth [$]1,000 leaving my house, and it's worth [$]1,000 now for whoever he can sell it to for parts."

¶15 Koepp stated, "I did tell him it was as is…. I wasn't hiding anything…. I was being as honest as I could. And I don't know why he thinks he can get four-grand for the motor if he sold it." Koepp continued, "He told me he had another motor that he was thinking about putting on. I did recommend that because the 90-horse is a little under power for it and only goes about 20 miles an hour. He did say he probably would put it on and he did put it on."

¶16 Koepp's testimony continued: "And I did tell him it was burning oil and I was adding oil every week. Every time the light would go off on me on a rough day I would get home and I would put oil in it. And I checked the oil; there was always oil; I always kept oil in the motor; it never ran out of oil." Koepp stated he used the boat "the whole season without any problems," including "the very last day of duck season on December 12th." Koepp then confirmed that the circuit court had reviewed his answer, which includes a photo that Koepp stated showed "the boat [in use] on December 11th, the last two days of duck season."

¶17    Koepp stated he "d[id]n't know if I paid two-grand, three-grand, four-grand for [the motor]," but that he bought it "on a skid, I put it in the back of my truck and dropped it off at [the technician's] with the boat and he put it on for me.  Ran it, test-drove it on the river, no problems.  It worked fine for eight years with just winterizing it and the oil changes."  Koepp continued,

> So I did tell him I … never changed the impeller or nothing on the motor in eight years.  I said yes, a tune-up or something like that I would for sure do, because I haven't done anything to the motor besides oil changes and winterizing it every year.
>
> I used it 30 days the last eight years, 30 days of duck season the last eight years in a row, and it's never let me down besides the one day it blew a fuse and I couldn't figure that out.  But that's why there was a kicker on the boat to get in.  That's the only time I ever had to use the kicker to get in.  I showed them where the fuse was.
>
> … I was being as honest as I can when I sold it.  And I believe the motor is only worth $1,000 for parts because it's painted gray.  Nobody's going to buy it from you and put it on their pontoon.  And I did not never say it was in excellent high retail or excellent condition, never mentioned that once.  But it was painted gray and all scratched up, and I don't know, it even had a couple BB holes in it, so I don't know how you're going to resell it for four-grand.  And it doesn't pay to get it fixed because it's not worth four-grand, as they didn't get it fixed.

Koepp stated: "I'm sure it had a lot of hours on it.  It was not high retail, it was not three-grand, it was used trade-in value or way less because it was painted gray.  So suing me for [$]4,000 I think is ridiculous."

¶18    The circuit court asked Koepp, "So the [$]8,000 was for the boat and the motor," to which Koepp responded,

> Yes, when I sold it to him, and the kicker and … everything else that was on the boat….

> I believe the boat, a 20-foot boat, big aluminum like that, I mean scrap value of aluminum is worth a decent amount. I mean, sue me for four-grand, then you get the whole boat and everything for three-grand is kind of ridiculous, because I would take it back for that….

¶19 During cross-examination, Koepp testified that the motor was sold new in 2004 for approximately $8,000. He added that now "[t]he motor is 20 years old and lost way more than 50 percent of its value, especially because it had BB holes in it and it's painted gray. You're not going to sell it to someone to put on their pontoon boat for four-grand."

¶20 Following his testimony, Koepp asked the circuit court if Wisconsin "is an as is sale or state." In response, the court referred to and read aloud WIS. STAT. §§ 402.315 and 402.316(3)(a) and (b).

¶21 In rebuttal, Treyton testified that

> When we were looking at the boat with him … he did say that … he's had to put oil in it, but I mean all motors you do. He never stated that he had to put oil in it after every time that he uses it. I guess with him saying that he had to put oil in it all the time, that kind of already says that the hole was there, considering that when … our mechanics put the oil in and it ran right out the bottom onto the floor.

Treyton pointed out that the "bill of sale," which was attached to the complaint, "does not say 'as is.'" He explained that he himself took the photos of the motor showing the hole in the bottom of it, which photos were submitted as exhibits. He explained that he took the photos after he had Riggs Marine inspect the motor because

> the hole in the powerhead … can't [be seen] just from taking the cover off the motor, it's deep in there. That's why we're, however much, $1,000 into the labor in finding the issue is because of how deep it was in the motor, so that's why we couldn't see it until someone spent hours

taking it apart, and then that's when they found it and told
me, I said I'll get over there, took pictures of it.

Treyton suggested the epoxy "was on there to cover" up the hole, prompting Koepp to respond that "[t]his had to be before I bought the motor and it was deep in." Treyton stated, "Could be," and Koepp then stated, "Motor has never been taken apart since I owned it." The circuit court asked Treyton, "Can I assume that epoxy is not a normal way to patch that type of hole?" Treyton responded, "Not even a little bit, it's pretty redneck rigged up."

¶22    Treyton and Artie made no other statements or argument to the circuit court. Koepp emphasized that he had told Treyton the sale was "as is," further commenting, "I guess I'm going to have to write that on every bill of sale from now on for sure." He stated that he "gave no warranty …. I told him everything I knew. And the boat ran the last day of duck season. They bought it two weeks later after duck season and that was the end of it."

¶23    Ruling in Treyton and Artie's favor, the circuit court stated that

> this issue turns on what the written bill of sale says, and it doesn't have language like "as is" or "with all faults."
>
>     You had the boat and the motor for eight years. I'm going to find that there was a breach of the implied warranty. I am going to find that the plaintiff[s have] met [their] burden and the hole in the motor that was patched with epoxy was not disclosed, [and] it was not discoverable prior to the transaction.

The court awarded Treyton and Artie the $4,420.08 they requested in the complaint.

¶24    Koepp appeals.

### *Discussion*

¶25 When a matter is tried to the circuit court, as in this case, "the weight of the testimony and the credibility of the witnesses are matters peculiarly within the province of the [circuit] court acting as the trier of fact" because the court has a superior opportunity "to observe the demeanor of witnesses and to gauge the persuasiveness of their testimony." ***Tang v. C.A.R.S. Prot. Plus, Inc.***, 2007 WI App 134, ¶19, 301 Wis. 2d 752, 734 N.W.2d 169 (citations omitted). Thus, we will not set aside a circuit court's findings of fact unless they are clearly erroneous. WIS. STAT. § 805.17(2). We review de novo the court's application of those facts to a statute. *See **Hefty v. Strickhouser***, 2008 WI 96, ¶27, 312 Wis. 2d 530, 752 N.W.2d 820.

¶26 Ruling in Treyton and Artie's favor, the circuit court looked to WIS. STAT. §§ 402.315 and 402.316. Those statutes provide in relevant part as follows:

> **402.315 Implied warranty: fitness for particular purpose**. Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under [WIS. STAT. §] 402.316 an implied warranty that the goods shall be fit for such purpose.
>
> **402.316 Exclusion or modification of warranties**.
>
> ….
>
> (2) Subject to sub. (3), … to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."
>
> (3) Notwithstanding sub. (2), all of the following apply:

(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty.

(b) When the buyer before entering into the contract has examined the goods or the sample or model as fully as the buyer desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to the buyer.

¶27     Koepp challenges the circuit court's "determination that there was an implied warranty that the motor was fit for a particular purpose pursuant to [WIS. STAT. §] 402.315," asserting that "it was not established that Treyton was relying on [Koepp's] skill or judgment to select or furnish suitable goods." Koepp states that "[t]here was no testimony or evidence presented that [Koepp] was either aware of a particular purpose, was involved in the selection of a particular good for a particular purpose, or that Treyton relied on [Koepp] to select a good for his particular purpose." We think the evidence supports the court's decision.

¶28     As applicable here, WIS. STAT. § 402.315 provides that the sale of the boat with motor included an implied warranty of fitness if Koepp had "reason to know any particular purpose for which" the boat and motor were needed and that Treyton was "relying on [Koepp's] … judgment to … furnish suitable goods." Koepp certainly had reason to know his boat with motor would be needed to carry and propel persons or things on a body of water. Even if Koepp had reason to believe Treyton would put a different motor on the boat and resell the one Koepp had on it at the time of sale, Koepp still would have known that Treyton was relying on Koepp's judgment that the motor was in sufficient working condition to fulfill its natural, obvious and intended purpose—propel a boat on water. Additionally, the evidence presented at trial was that Treyton and Artie could not

have discovered the hole prior to their purchase of the motor, as it was undiscoverable until the motor was taken apart. Treyton and Artie were relying upon Koepp's express or implied representation that the motor would sufficiently function to propel a boat on a body of water.

¶29    The circuit court found that Koepp provided, at a minimum, an implied representation that the motor would meet its natural, obvious and intended purpose, and it also found that the motor failed to satisfy this implied warranty. Treyton testified that the first time he viewed the boat and motor, Koepp told him "that the motor had no issues other than blowing a fuse, which he replaced, and only needed a tune-up." Treyton stated Koepp made similar comments the second time Treyton viewed it. Additionally, Artie testified that Koepp represented that "it was a little slower, slower boat, but that was it." This testimony supports the circuit court's finding that Koepp represented that the motor would function as it should for the purpose of propelling a boat on water, even if it did so "a little slower." Also, during his own testimony, Koepp acknowledged representing to Treyton "the 90-horse" was "a little under power for [the boat] and only goes about 20 miles an hour." Koepp had reason to know Treyton expected the motor to be in sufficient condition to propel a boat and that he was relying on Koepp's knowledge of the motor and judgment to furnish a motor that worked for that purpose. The court did not err in concluding the sale included an implied warranty and that that warranty was breached because the motor-with-a-hole-in-it could not meet its purpose—to propel a boat.

¶30    Koepp next contends the circuit court erred in awarding Treyton and Artie the full $4,420.08 in damages they requested in the complaint based upon the invoice from Riggs Marine indicating it would cost that much to repair the motor. Koepp so contends because he presented documentary evidence opining a

used trade-in value of $1,770 for the motor. It appears to us, however, that the trade-in value would be for a *working* motor; however, the motor Koepp sold to Treyton had a hole in it that caused oil to immediately drain out and thus was not functioning as it should. What the evidence does indicate is that Treyton cannot use it for reliably propelling the boat he bought from Koepp unless it is repaired.

¶31     On appeal, the appellant, here Koepp, bears the burden of showing that the circuit court erred. *See Gaethke v. Pozder*, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381. Koepp has not met that burden.[2]

> *By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[2] Koepp also complains that the $4,420.08 award erroneously "included labor costs associated with detecting additional problems with the motor ($540) and also apparently costs for the tune-up of the motor ($868.95), which Treyton knew was necessary at time of sale and therefore part of the bargain." Because Koepp raises these issues for the first time on appeal, we do not consider them. *See State v. Caban*, 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997) ("[I]ssues not presented to the circuit court will not be considered for the first time on appeal."). Moreover, we also do not consider them because he has failed to develop them. *See Clean Wis., Inc. v. PSC*, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."). Furthermore, Koepp does not develop an argument challenging the reasonableness of the particular cost of repair in the estimate submitted by Treyton.