**COURT OF APPEALS
DECISION
DATED AND FILED**

**May 15, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos.  **2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888**
STATE OF WISCONSIN

Cir. Ct. Nos. **2023TP102
2023TP103
2023TP104
2023TP105
2023TP106
2023TP107**

**IN COURT OF APPEALS
DISTRICT I**

---

**APPEAL NO. 2025AP2883**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO G.E.G., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

　　　　**PETITIONER-RESPONDENT,**

　　**V.**

**M.G.,**

　　　　**RESPONDENT-APPELLANT.**

---

Nos.  2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

**APPEAL NO. 2025AP2884**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO C.J.-J.G., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

  **V.**

**M.G.,**

       **RESPONDENT-APPELLANT.**

**APPEAL NO. 2025AP2885**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO A.R.G., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

  **V.**

**M.G.,**

       **RESPONDENT-APPELLANT.**

2

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

APPEAL NO. 2025AP2886

IN RE THE TERMINATION OF PARENTAL RIGHTS TO S.R.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

   V.

M.G.,

      RESPONDENT-APPELLANT.

APPEAL NO. 2025AP2887

IN RE THE TERMINATION OF PARENTAL RIGHTS TO K.J.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

   V.

M.G.,

      RESPONDENT-APPELLANT.

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

APPEAL NO. 2025AP2888

IN RE THE TERMINATION OF PARENTAL RIGHTS TO N.H.-J.G., A
PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

       PETITIONER-RESPONDENT,

  V.

M.G.,

       RESPONDENT-APPELLANT.

---

APPEALS from orders of the circuit court for Milwaukee County: JOSEPH R. WALL, Judge. *Affirmed*.

¶1    COLÓN, P.J.[1]  Molly appeals from orders terminating her parental rights to her six children: Ginny, Charlie, Alicia, Sybill, Katie, and Nick.[2] Molly argues that the circuit court erred when it found that the State had proven by clear and convincing evidence that the Department of Milwaukee Child Protective Services (DMCPS) had made reasonable efforts to provide her with court-ordered services, and that Molly had failed to assume parental responsibility for three of

---

[1] These appeals are decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] We refer to the family in this matter by initials or pseudonyms to maintain confidentiality and privacy, in accordance with WIS. STAT. RULE 809.19(1)(g).

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

her six children. For the following reasons, we disagree with Molly, and affirm the orders of the circuit court.

## BACKGROUND

¶2     In April 2022, DMCPS received a referral alleging that Nick, who was then eight months old, had missed a weight check after being diagnosed with failure to thrive. The initial assessment worker who responded determined that the conditions of the home were unsafe because of excessive clutter, choking hazards within the reach of small children, and concerns that parental responsibilities for the younger children were being placed on the older children.

¶3     After intensive in-home services failed, the children were taken into temporary physical custody by DMCPS on April 11, 2022. The circuit court entered identical CHIPS dispositional orders on November 14, 2022. The orders required that DMCPS make reasonable efforts to assist Molly in (among other services) completing a psychological evaluation and following all the recommendations therein, and securing medication management, taking all medications as prescribed.

¶4     Molly completed the required psychological evaluation on January 25, 2023. The evaluating doctors found that Molly's cognitive abilities ranged from "Extremely Low" to "Borderline." They further stated in the psychological evaluation report that Molly "may have trouble understanding and expressing herself with language, engaging in problem solving, attending and storing information in her mind (e.g., remembering instructions or what was said in appointments), and may struggle to sustain her concentration or make decisions."

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

They also diagnosed Molly with posttraumatic stress disorder and an unspecified mood disorder.

¶5      On June 30, 2023, the State petitioned to terminate Molly's parental rights.  As grounds, the State alleged that the children were in continuing need of protection or services (continuing CHIPS) and that Molly had failed to assume parental responsibility.

¶6      A court trial was held in September and October of 2024.  At trial, Molly testified that she had cooperated with the psychological evaluation and had gone to therapy, though she admitted she had attended inconsistently, and had switched therapists multiple times.  Molly recalled that the psychological evaluation report recommended that she engage in therapy and take all her medications as prescribed.  Molly testified that she was currently on four medications and was taking all of them as prescribed, and that she did not need any help with medication management.

¶7      Molly further testified that, initially, she had scheduled all appointments for the children herself, but eventually needed the children's caregivers to do it.  She confirmed that she was aware of all of her children's appointments and attended most of them.  She listed that she attended Sybill's GI, urology, therapy, occupational therapy, and primary care appointments; Alicia's and Katie's therapy appointments; Charlie's physical therapy appointments; ear appointments for Alicia and Nick, Alicia's and Charlie's IEP and speech therapy appointments, and dental appointments for all of the children.  Molly stated that she was on good terms with the children's foster parents and would text them for

6

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

updates about the children. One of the foster parents also testified about communicating with Molly, specifically about Sybill's dietary restrictions ahead of visits.

¶8     The circuit court also heard testimony from the ongoing case manager, Sarena Farber. Farber agreed that Molly had completed the psychological evaluation, and stated that she had discussed the results of the evaluation with Molly and had offered to make referrals for therapy and medication management. According to Farber, Molly initially declined a referral for therapy but later changed her mind; however, the therapist to which Farber referred her did not take Molly's insurance. Molly was able to find a therapist on her own in February 2023. At the time of trial, Molly had seen three therapists, each of which she had found on her own. Farber testified that she provided a copy of the psychological evaluation and documents from the CHIPS case to only one of Molly's therapists.

¶9     According to Farber, Molly originally told Farber that she didn't need a referral for medication management because she could manage her own medications. Farber testified that she encouraged Molly to see a psychiatrist for medication management at least four or five times, but Molly never took her up on the offer. At one point, Molly told Farber that she was not taking one of her medications as prescribed, and Farber again encouraged Molly to discuss it with her doctor.

¶10     At the conclusion of the trial, the circuit court found that the State had proved by clear and convincing evidence that grounds existed to terminate

7

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

Molly's parental rights to all six children. It concluded that the State had proven the ground of continuing CHIPS as to all six children, and the ground of failure to assume parental responsibility as to the three youngest children. Molly moved for judgment notwithstanding the verdict on the basis of insufficient evidence, which the court denied.

¶11    The dispositional phase of the case took place on February 26, 2025. Molly did not appear at the hearing, as she had checked herself into a mental health facility. The circuit court heard testimony from the foster parents and Farber, and ultimately decided that it was in the best interests of the children to terminate Molly's parental rights.

¶12    Molly now appeals. Additional facts will be discussed as needed.

**STANDARD OF REVIEW**

¶13    The State has the burden to prove, by clear and convincing evidence, every element of the grounds alleged in the petition. *See St. Croix Cnty. DHHS v. Michael D.*, 2016 WI 35, ¶28, 368 Wis. 2d 170, 880 N.W.2d 107. On review, this court examines all of the testimony and other evidence presented in analyzing whether "any credible evidence" supports the verdict. *Sheboygan Cnty. DHHS v. Tanya M.B.*, 2010 WI 55, ¶49, 325 Wis. 2d 524, 785 N.W.2d 369. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2). "The [circuit] court, not the appellate court, … resolve[s] conflicts in the testimony, … and we review the evidence in the light most

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

favorable to the findings made by the [circuit] court." ***Tang v. C.A.R.S. Prot. Plus, Inc.***, 2007 WI App 134, ¶19, 301 Wis. 2d 752, 734 N.W.2d 169.

## DISCUSSION

**I. The circuit court did not err when it found that the State had proved by clear and convincing evidence that DMCPS had made "reasonable efforts" to provide services to Molly.**

¶14    Molly first argues that the State did not prove by clear and convincing evidence that DMCPS made reasonable efforts to provide her with services in helping her to fulfill the requirements of the CHIPS dispositional orders.  In particular, Molly asserts that DMCPS failed to make reasonable efforts to help her follow all of the recommendations stemming from her psychological evaluation, and to provide her with medication management.

¶15    The State is required to prove that DMCPS made a "reasonable effort" to provide court-ordered services.  WIS. STAT. § 48.415(2)(a)2. "Reasonable effort" is defined as "an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent, … the level of cooperation of the parent … and other relevant circumstances of the case." ***Id.***

¶16    The recommendations made in the psychological evaluation report for Molly are organized by bullet point.  Under the heading, "Psychiatry & Psychotherapy," are five sections.  The first section recommends that Molly "consult with a psychiatric provider to determine the best treatment for her symptoms of PTSD and possible mood-related symptoms."  The second

9

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

recommends that Molly "establish a long-term relationship with a mental health professional to determine whether she may meet criteria for more specific diagnoses that would better inform her treatment," noting that Molly "may require the use of motivational interviewing strategies to participate in services." The third recommendation states that Molly would likely "benefit from a strengths-based and trauma-informed approach that [would] provide concrete ways to understand and regulate her emotions and develop important skills." It then lists things that may be helpful for Molly to work on in therapy, including "[i]dentifying and expressing strong negative emotions in a safe and comfortable way," "[i]nterception awareness for self-regulation, self-awareness, and problem solving," "[u]tilizing emotion-regulation and grounding strategies," and "[p]racticing taking others' perspective and fostering empathy."

¶17 The fourth recommendation lists certain adaptations in therapy that Molly may benefit from, including "[a]djusting [the] pace of therapy and number of ideas or themes addressed" and "[u]sing basic rather than abstract concepts … that are developmentally appropriate and simplified language." Finally, the fifth recommendation lists therapeutic approaches that could be effective for Molly given her concerns, including "Motivational Interviewing" and "Cognitive Behavioral Therapy."

¶18 Molly first asserts that DMCPS did not make reasonable efforts to help her follow all recommendations in the psychological evaluation because its efforts focused on only the first two bullet points of recommendations (i.e., that Molly consult with a psychiatric provider and establish a long-term relationship with a mental health professional), and Farber testified that she did not share the

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

evaluation with two of Molly's three therapists. Molly contends that the circuit court failed to consider the fact that she ultimately had to find her own therapist after the therapist to which Farber referred her did not take her insurance.

¶19    In addition, Molly argues that the State provided no evidence that Farber made reasonable efforts to help her establish a long-term relationship with a mental health professional. She points to the fact that there was no testimony from Farber indicating that Farber had intended to place another referral for Molly if she was unable to find a therapist on her own, nor that she helped Molly find other therapists. In addition, she argues that the State provided no evidence that Farber communicated with any of the therapists to ensure that they were following the treatment plan recommended in the psychological evaluation report, nor did the State call any of Molly's therapists to testify to the sort of therapies provided to Molly. Molly further points out that, of the three therapists Molly saw and provided releases for, Farber only sent the psychological evaluation report to one of them.

¶20    Thus, Molly argues that the State did not introduce any evidence that Farber made an "earnest and conscientious effort to take good faith steps" to ensure that any of Molly's therapists were aware of the recommendations in the psychological evaluation and were engaging in proper therapies with her. In Molly's view, there was no credible evidence supporting the circuit court's conclusion that DMCPS made a reasonable effort to provide her with services.

¶21    Molly's understanding of the recommendations made in the psychological evaluation report is confused. She incorrectly interprets the

11

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

evaluation report to recommend that DMCPS fulfill each and every one of the bullet points contained therein. However, a simple reading of the report on its face, and as a whole, indicates that the majority of the bullet points were recommendations for *therapists*, not DMCPS. The bullet points discussed ways in which a therapist could best assist Molly and her mental and emotional needs, as well as the types of therapies from which Molly would be most likely to benefit. Molly's interpretation of the report is erroneous because only the first two bullet points were actual recommendations for *services*. Additionally, we point out that it would be illogical for DMCPS to somehow be required to engage in therapies with Molly, as Molly's interpretation would require us to conclude.

¶22     Of the bullet points contained in the report that *did* apply to DMCPS, we conclude that the court did not erroneously exercise its discretion when it found that the State had proven by clear and convincing evidence that DMCPS had made reasonable efforts to help Molly find and engage with a therapist. The evidence here sufficiently established that DMCPS made "reasonable efforts" to make referrals and to try to get Molly to engage with court-ordered services; however, a case manager cannot force a parent to engage with service providers.

¶23     In *State v. Raymond C.*, 187 Wis. 2d 10, 522 N.W.2d 243 (Ct. App. 1994), Raymond C. appealed a circuit court order terminating his parental rights to his two children, contending that the court erred when it concluded that the Eau Claire County DHS had made a "diligent effort" to provide him with court-ordered

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

services, as required by WIS. STAT. § 48.415(2)(b) (1993-94).[3]  Raymond argued

that, because he was developmentally disabled and unable to read, the County was

required to do more than its ordinary procedures for helping parents comply with

the court-ordered conditions for the return of their children.  ***Raymond C.***, 187

Wis. 2d at 12.  The court had imposed three conditions on Raymond for the return

of his children to the home: (1) that Raymond maintain contact with his children,

with contact as close to every other week as possible; (2) that Raymond maintain

at least monthly contact with the children's social worker and keep the County

informed of any changes in his status; and (3) that Raymond maintain a residence

suitable and adequate to meet the needs of those who lived there.  ***Id.*** at 13.

¶24     At trial, the circuit court heard evidence that, while Raymond was

developmentally disabled and unable to read, he had a driver's license.  ***Id.*** at 13.

The social worker assigned to the case knew that Raymond was developmentally

disabled, but testified that Raymond never told her he could not read.  ***Id.***  The

social worker stated that she had approximately eight to ten conversations with

Raymond, most of which concerned his requests to have contact with the children.

***Id.***  The social worker testified that, as far as she was aware, Raymond had had

two contacts with his children, and that he had not visited his children in quite

---

[3]  WISCONSIN STAT. § 48.415(2) (1993-94) stated that "[c]ontinuing need of protection or services may be established by a showing of all of the following: … (b) That the agency responsible for the care of the child and the family has made a diligent effort to provide the services ordered by the court."  We held in ***M.P. v. Dane Cnty. DHS***, 170 Wis. 2d 313, 331-32, 488 N.W.2d 133 (Ct. App. 1992) that "diligent effort" meant a "reasonable, earnest, and energetic effort."

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

some time and had failed to show up at three visits he had arranged. *Id.* In addition, Raymond failed to keep the social worker informed of his address. *Id.*

¶25 The social worker admitted that there was no case plan in place to help Raymond meet the conditions of return; however, she stated that she was often unable to facilitate Raymond's completion of the court-ordered services because Raymond failed to provide her with updated addresses and phone numbers. *Id.* at 13-14. Based on the evidence provided, the circuit court terminated Raymond's parental rights, finding that Raymond had substantially neglected the conditions established for the return of his children, and that the County had made a diligent effort to provide Raymond with court-ordered services. *Id.* at 14.

¶26 On appeal, this court concluded that the circuit court's finding, that the County had made a "diligent effort" to provide the services ordered by the court, was not clearly erroneous. *Id.* at 16. We did so based on the fact that: (1) while the social worker was unaware that Raymond could not read, she knew that Raymond was developmentally disabled; (2) the County sent Raymond numerous letters telling him to contact the social worker; (3) nothing in the record indicated that, because of his developmental disability, Raymond was unable to understand the nature of the correspondence sent to him, nor that the inability to read deprived Raymond of an opportunity to understand the correspondence because no one was available to read or explain it to him; (4) the social worker testified she had eight to ten verbal conversations with Raymond; (5) much of the County's inability to facilitate Raymond's completion of the court-ordered conditions was attributable to Raymond's failure to keep appointments he

14

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

scheduled and to keep the County informed of his current address or phone number; and (6) the County made earnest and energetic efforts to provide services to Raymond and acted reasonably in light of Raymond's disability. *Id.* at 16-17.

¶27     In the present case, Molly was initially resistant to any referrals to therapy, indicating that she did not believe she needed it. Nevertheless, Farber still made a referral to Wisconsin Community Services (WCS); however, that provider did not accept Molly's insurance. Farber did not make additional referrals for therapy because Molly indicated that she had found her own therapist by the time the WCS referral was rejected. Molly initially signed releases so that Farber could exchange information with the therapy providers, but Molly was inconsistent with therapy and was at one point discharged for nonattendance.

¶28     Although Molly switched providers multiple times and had inconsistent attendance; Farber did send materials to the provider that Molly saw for the longest period of time, including the psychological evaluation report, the CHIPS petition, and permanency plans. Of Molly's three therapists, she was with two of them for about one month each—which the State argues was not a sufficient period of time for case management to identify the therapist, get releases signed, and information exchanged.

¶29     The circuit court found that Molly was "at times" cooperative, but was "for the most part, very, very antagonistic and uncooperative" with Farber. Molly was found to be "hostile" to Farber, and evidence was presented that Molly went as far as blocking Farber's phone number during the case, or otherwise ignoring Farber's attempts to communicate, schedule meetings, or provide other

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

services. Additionally, the court found that that Farber went to "great, great lengths … to provide [Molly] with the various services." Thus, similar to the parent in **Raymond C.**, Molly's own actions significantly interfered with the ability of DMCPS to assist her in participating in therapy, and it was not erroneous for the circuit court to find that DMCPS's efforts to do so were reasonable.

¶30 Molly next argues that the State did not prove by clear and convincing evidence that DMCPS made reasonable efforts to provide her with medication management services. Molly points out that the CHIPS dispositional order required DMCPS to provide "[m]edication [m]anagement" to ensure that Molly "take all medications as prescribed." Molly insists that the State did not introduce sufficient evidence to demonstrate that Farber attempted to understand Molly's medical needs.

¶31 At trial, Farber testified that, after Molly stated that she would work with her primary care provider to manage her medications, Farber did not make a referral for any kind of medication management. In addition, Molly argues that Farber did not attempt to determine who Molly's prescribing physician was. Molly argues that the State introduced no evidence demonstrating that Farber made any attempt to ensure Molly was managing her medications, other than asking Molly if she was taking them as prescribed. When Molly indicated that she was not taking her medications as prescribed, Farber did not attempt to assist Molly in taking them as prescribed, other than telling her to discuss it with her physician. In addition, Farber never looked at Molly's prescription bottles to see what they were, how they should be taken, or to confirm whether Molly was taking them correctly. There was no testimony indicating Farber requested that

16

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

Molly sign a medical release so that she could see the medications Molly was taking. Thus, Molly insists that the court incorrectly put the onus on her, rather than on Farber, to provide the medication management services.

¶32 As stated previously herein, the statute requires that DMCPS make "reasonable efforts" to provide the services mandated in the dispositional order. However, Molly's argument as to the steps that DMCPS should have taken goes beyond "reasonable" into the realm of "extraordinary." Molly provides no authority for her contentions that Farber should have insisted on making a referral for medication management even after Molly declined it and insisted that she could handle it herself; that Farber should have somehow "ensure[d]" that Molly was taking her medications as prescribed; or that Farber should have somehow assisted Molly in taking them as prescribed. Farber was not required to personally manage Molly's medications. Farber testified that she discussed a psychiatry referral with Molly, but Molly told Farber she did not need it, stating that she could manage her own medications. Molly later claimed to be seeing a psychiatrist through her primary care provider, but never gave Farber sufficient information to confirm it, although Farber tried to discuss it with Molly at least four or five times.

¶33 Nothing in the records suggest that Farber is qualified to delve into the realm of prescription medication or offer any sort of advice or assistance other than to recommend to Molly that she consult with a physician. It would have been ill-advised, even careless, for Farber to do so. The records clearly indicate that Molly's own resistance to Farber's efforts made it impossible for Farber to move forward with providing any sort of medication management services. The circuit

17

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

court properly concluded that the State had proved by clear and convincing evidence that DMCPS made reasonable efforts to help Molly participate in medication management services.

### II. The circuit court did not err when it found that the State had proved by clear and convincing evidence that Molly had failed to assume parental responsibility for her three youngest children.

¶34    Under WIS. STAT. § 48.415(6)(a), failure to assume parental responsibility is "established by proving that the parent … of the child [has] not had a substantial parental relationship with the child."  A "substantial parental relationship" is defined as "acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child."  WIS. STAT. § 48.415(6)(b).  In evaluating whether the parent has a substantial parental relationship with the child, the court considers multiple factors, including (but not limited to) "whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child," *id.*, and "whether the parent, while caring for the child, exposed the child to a hazardous living environment," *Tammy W–G. v. Jacob T.*, 2011 WI 30, ¶38, 333 Wis. 2d 273, 797 N.W.2d 854.

¶35    Molly argues that the State did not prove by clear and convincing evidence that she failed to assume parental responsibility for her three youngest children, Sybill, Katie, and Nick.  She particularly takes issue with the court's conclusion that she did not have a substantial parental relationship with them.  Molly points out that the circuit court distinguished the two sibling groups (the

18

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

three oldest children and the three youngest) based on how long they had been in out-of-home care.

¶36     While the circuit court acknowledged that, once children go into foster care, it is very difficult for a parent to have a substantial relationship with them, Molly insists that the court did not adequately take into account her efforts to do so. She argues that, once the children were removed from the home, she parented them as much as DMCPS would allow her. Molly points out that she attended supervised visits with Sybill, Katie, and Nick weekly until DMCPS reduced the visits to every other week. At trial, Farber estimated that Molly attended 70-75% of visits, and acknowledged that sometimes DMCPS was the one that had to cancel the visit, not Molly. In April 2024, visitation with the three youngest was suspended at the request of the children's guardian *ad litem*, and Molly was instructed to meet with the children's therapist until they felt she was ready for family therapy.

¶37     Molly also argues that she attended Sybill and Katie's parent/teacher conferences (Nick was too young for school at the time). Molly acknowledged that, early in the case, Sybill had disclosed that her paternal grandfather had sexually assaulted her, and Molly had not believed her; however, at trial, Molly testified that she was working with Sybill's therapist to understand the disclosure, and stated that she would not live with her father-in-law again in the future. Molly also points out that she attended almost all of the children's many medical appointments, including routine check-ups and dental appointments; Nick's ear appointments; Sybill's occupational therapy, urology, and GI appointments; and therapy appointments for Katie and Sybill.

19

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

¶38     Molly thus insists that the circuit court did not adequately take her efforts to assume parental responsibility into account, and instead relied too much on the fact that the children were in out-of-home care.  We disagree.

¶39     While the circuit court did take into consideration the fact that the three youngest children had been in out-of-home care for a significant part of their lives, it acknowledged that being in out-of-home care served as an obstacle to Molly's ability to parent her children.  The fact that the children were in out-of-home care was not the focus of the court's findings on this issue; the evidence on the whole still demonstrated that Molly had neglected the children and had exposed them to hazardous living conditions.  *See Tammy W–G.*, 333 Wis. 2d 273, ¶38.

¶40     The circuit court heard testimony that, at removal, the home was in a deplorable condition, with the floors soaked in cat urine, garbage and toys covering the floor, and many animals in the home.  In addition, the home conditions did not improve even after removal, and Molly and her husband refused home management services.  The older children were often made to be responsible for the feeding and care of the three youngest children, and Molly and her husband placed the responsibility of cleaning the home on the children.  After being forced to leave the home, Molly and her husband chose to live in their vehicle rather than seeking out other housing options such as shelters.  The court also heard testimony that Molly admitted to occasionally biting the children as a form of physical discipline.

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

¶41 Further, the court heard that Nick was not being fed properly despite being diagnosed with failure to thrive. Nick therefore had to be hospitalized multiple times; he gained significant weight while in the hospital but this slowed when he would return home with Molly. In addition, Sybill had been diagnosed with a food allergy which caused her to become ill when she was not following a strict diet; despite this, Molly and her husband often fed Sybill restricted foods, declined meetings or additional coaching on the matter, and indicated that they were not interested in following the diet.

¶42 The State also provided evidence that the children were routinely exposed to the paternal grandfather, who had a documented arrest history on at least two occasions for sexual assault of other minor children. Alice had demonstrated visible fear of the grandfather during visitation, and Sybill later disclosed that he had sexually abused her. Molly disregarded and diminished all of this evidence, continuing to request that the grandfather be allowed to visit with the children, continuing to talk about the grandfather to the children, and testifying that she did not believe he was a safety concern.

¶43 Overall, the evidence provided by the State was more than sufficient to demonstrate that Molly had failed to assume parental responsibility for her three youngest children. The majority of their lives were characterized by hazardous living environments; neglect of their physical and emotional health; exposure to sexual abuse; and disregard for their overall wellbeing. We therefore conclude that the circuit court did not err in finding that the State demonstrated this by clear and convincing evidence.

Nos. 2025AP2883
2025AP2884
2025AP2885
2025AP2886
2025AP2887
2025AP2888

**CONCLUSION**

¶44     For all of the aforementioned reasons, we affirm the orders of the circuit court.

*By the Court.*—Orders affirmed.

This opinion will not be published.     *See* WIS. STAT. RULE 809.23(1)(b)4.

22