COURT OF APPEALS
DECISION
DATED AND FILED

May 15, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos. **2026AP469**
**2026AP470**
**2026AP471**
**2026AP472**
**2026AP473**
**2026AP474**
**STATE OF WISCONSIN**

Cir. Ct. Nos. **2023TP102**
**2023TP103**
**2023TP104**
**2023TP105**
**2023TP106**
**2023TP107**

**IN COURT OF APPEALS**
**DISTRICT I**

APPEAL NO. **2026AP469**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO G.E.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

V.

J.G., III

RESPONDENT-APPELLANT.

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

APPEAL NO. 2026AP470

IN RE THE TERMINATION OF PARENTAL RIGHTS TO C.J.-J.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

v.

J.G., III

RESPONDENT-APPELLANT.

APPEAL NO. 2026AP471

IN RE THE TERMINATION OF PARENTAL RIGHTS TO A.R.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

v.

J.G., III

RESPONDENT-APPELLANT.

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

APPEAL NO. 2026AP472

IN RE THE TERMINATION OF PARENTAL RIGHTS TO S.R.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

  PETITIONER-RESPONDENT,

 V.

J.G., III,

  RESPONDENT-APPELLANT.

APPEAL NO. 2026AP473

IN RE THE TERMINATION OF PARENTAL RIGHTS TO K.J.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

  PETITIONER-RESPONDENT,

 V.

J.G., III,

  RESPONDENT-APPELLANT.

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

**APPEAL NO. 2026AP474**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO N.H.-J.G., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

  **PETITIONER-RESPONDENT,**

 **V.**

**J.G., III,**

  **RESPONDENT-APPELLANT.**

APPEALS from orders of the circuit court for Milwaukee County: JOSEPH R. WALL, Judge. *Affirmed*.

¶1    COLÓN, P.J.[1]   John appeals orders terminating his parental rights to his six children, Ginny, Charlie, Alice, Sybill, Katie, and Nick.[2]   John argues that the circuit court erred when it concluded that the State had proved by clear and convincing evidence that grounds existed to terminate his parental rights, and when it found that termination was in the children's best interests.   For the

---

[1] These appeals are decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24).  All references to the Wisconsin Statutes are to the 2023-24 version.

[2] We refer to the family members by pseudonyms to maintain confidentiality and privacy, in accordance with WIS. STAT. RULE 809.19(1)(g).

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

following reasons, we disagree with John, and affirm the orders of the circuit court.

## BACKGROUND

¶2    In November 2021, the Department of Milwaukee Child Protective Services (DMCPS) received a referral regarding possible neglect as it related to Ginny, Charlie, Alice, Sybill, Katie, and Nick.  The referral noted safety concerns as to the condition of the home.  An initial assessment worker was sent to the home to investigate; she noted that the floor was covered in trash and other items, including choking hazards within reach of the young children.  There was also a strong smell of cat urine as well as gnats throughout the home.  The worker also learned at that time that Molly, John's wife and the mother of the six children, would sometimes bite the children as a form of discipline, and that John would not intervene to stop it.

¶3    When the initial assessment worker attempted to discuss the issues with the condition of the home with John and Molly, they blamed the children, who at that time ranged in age from seven years old to four months old, claiming that they were not cleaning up after themselves.  The initial assessment worker discussed having age-appropriate expectations of the children and that the condition of the home needed to be improved.  However, the children were not removed from the home at that time.

¶4    In April 2022, DMCPS received a second referral, this time regarding concerns about Nick, as he was not gaining weight and had been diagnosed with failure to thrive.  Molly and John had missed several weight

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

checks for Nick, and after being assessed by a DMCPS worker, Nick had to be admitted to the hospital for several days.

¶5      The initial assessment worker visited the home for a second time and noted that it was in worse condition than it had been previously. The worker noted that there was garbage and other items completely covering the floors, including toys, blankets, and food. The smell of cat urine was still strong throughout the home and the children's room had soiled clothes and diapers in it. The worker later learned that John and Molly would leave the duties of cleaning the home and feeding the younger children to Ginny and Charlie.

¶6      The agency attempted intensive in-home services, but these were unsuccessful. The home remained in a deplorable condition, and Nick stopped gaining weight after being released from the hospital and returning home. The agency took temporary physical custody of the children, and the court found the children to be in need of protection or services (CHIPS) on November 14, 2022. The court entered identical dispositional orders for each of the children, outlining the conditions that John would have to fulfill in order for the children to be returned to the home.

¶7      The State filed petitions to terminate John's parental rights on June 30, 2023.[3] As grounds, the State alleged that the children were in continuing need of protection or services (continuing CHIPS), and that John had failed to assume

---

[3] The State also moved to terminate Molly's parental rights based on identical grounds. Her parental rights are not at issue in these appeals.

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

parental responsibility for the children. On April 12, 2024, the circuit court considered the children's guardian *ad litem*'s motion to suspend visitation between John and the three youngest children, contending that the children's needs were not being met at visits and that the children were having negative reactions to visits. The court granted the motion.

¶8 A court trial took place throughout several days in September and October 2024. At the conclusion of trial, the court found that the State had proven the ground of continuing CHIPS as to all six children, and the ground of failure to assume parental responsibility as to the three younger children. The court found that there was insufficient evidence to prove that John had failed to assume parental responsibility as to the three older children. A few days later, the guardian *ad litem* filed a motion for visitation to occur only if the three older children and parents mutually desired it, arguing that the children were struggling with visitation and would benefit from having some control over the visits. The motion was stipulated to by John and Molly, and the court granted it on October 14, 2024.

¶9 The dispositional hearing took place on February 26, 2025, at which the circuit court heard testimony from various witnesses and ultimately determined that it was in the children's best interests for John's parental rights to be terminated.

¶10 John now appeals. Additional facts will be discussed as necessary.

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

**STANDARD OF REVIEW**

¶11     The State has the burden to prove, by clear and convincing evidence, every element of the grounds alleged in the petition. *See St. Croix Cnty. DHHS v. Michael D.*, 2016 WI 35, ¶28, 368 Wis. 2d 170, 880 N.W.2d 107.  On review, this court examines all of the testimony and other evidence presented in analyzing whether "any credible evidence" supports the verdict.  *Sheboygan Cnty. DHHS v. Tanya M.B.*, 2010 WI 55, ¶49, 325 Wis. 2d 524, 785 N.W.2d 369.  "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [circuit] court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2).  "The [circuit] court, not the appellate court, … resolve[s] conflicts in the testimony, … and we review the evidence in the light most favorable to the findings made by the [circuit] court."  *Tang v. C.A.R.S. Prot. Plus, Inc.*, 2007 WI App 134, ¶19, 301 Wis. 2d 752, 734 N.W.2d 169.

**DISCUSSION**

**I.  The circuit court did not erroneously exercise its discretion when it found that the State had proven, by clear and convincing evidence, that grounds existed to terminate John's parental rights under continuing CHIPS.**

¶12     WISCONSIN STAT. § 48.415(2) requires that the State prove, by clear and convincing evidence, that DMCPS made a "reasonable effort" to provide the services ordered by the court in the dispositional order, and that the parent failed to meet the conditions for safe return.  "Reasonable effort" is defined as "an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child … the level of cooperation of the parent … and other relevant

8

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

circumstances of the case." Sec. 48.415(2)(a)2.a. John argues that the State's evidence was insufficient because (1) DMCPS failed to provide "reasonable efforts" tailored to his specific cognitive and socioeconomic limitations; and (2) John's failure to meet certain conditions such as housing was a result of poverty rather than parental unfitness.

¶13    John points to the testimony of the ongoing case manager, Sarena Farber, wherein she acknowledged that John had disclosed "struggles with learning in school." John takes issue with the fact that, despite DMCPS being aware that he had struggled in school, it never "court-ordered" a psychological evaluation for him to establish his level of intellectual functioning. While John acknowledges that DMCPS did refer him for a psychological evaluation, he argues that, when the evaluation was cancelled due to weather, DMCPS never made any effort to reschedule it, "effectively leaving [his] specific learning needs unaddressed for the duration of the case."

¶14    John also points out that Farber admitted that her primary mode of communicating with him was through text and email, despite the fact that Farber knew that John "struggled with literacy and cognitive processing." He argues that DMCPS cannot claim it made "reasonable efforts" when it provided "complex, text-heavy requirements to a parent with known learning disabilities" and then claim he was uncooperative when he became overwhelmed or frustrated.

¶15    As an initial matter, we point out that DMCPS has no way of "court-ordering" a psychological evaluation for John, so his contention that the agency should have somehow done so is misguided. The dispositional order required that

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

DMCPS make reasonable efforts to provide him with services including (1) parenting education; (2) home management; (3) visitation; and (4) participation in children's services (as recommended). Because the court did not make any order requiring that John complete a psychological evaluation, the agency was under no obligation to assist him in doing so. Regardless, it appears that DMCPS *did* refer John for a psychological evaluation. John purportedly did not fill out the majority of the referral forms and, on the date of the evaluation, cancelled his appointment, citing weather concerns, in spite of the fact that he had driven Molly to complete her evaluation earlier that day. The evaluation was never rescheduled, with John claiming that he did not have a phone number for the provider. We also note that, at trial, Farber testified that John never reported that he had any disabilities or concerns about his mental health and memory, only that he had some "difficulty learning in school."

¶16 John noticeably omits those facts which indicate that he repeatedly frustrated DMCPS's efforts to communicate with him. Farber testified that John was not responsive and would hang up on her when she would call him. The circuit court found that John and Molly were "at times" cooperative, but were "for the most part, very, very antagonistic and uncooperative" with Farber "despite [her] great efforts." The court cited the fact that Molly and John would block Farber's phone number or wait days or weeks to get back to her. John cannot blame Farber for attempting to communicate with him via text or email when he prevented her from contacting him in any other manner.

¶17 John next takes issue with the fact that the State introduced evidence indicating that he had refused to believe his children's sexual assault disclosures

10

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

regarding their paternal grandfather. He insists that the agency never provided him with any of the specific details of the grandfather's prior police records or the exact allegations being made by the children. He cites to *Kenosha Cnty. DHS v. Jodie W.*, 2006 WI 93, 293 Wis. 2d 530, 716 N.W.2d 845, for the proposition that "a parent cannot be found unfit for failing to meet a condition that is impossible to satisfy without agency assistance." He argues that, by withholding the specific evidence that would have allowed him to grasp the entirety of the risk posed by the grandfather, DMCPS failed to help him meet the condition of "safety." He insists he was essentially asked to "take the agency's word for it" without any evidence to overcome "familial loyalty and parental instinct."

¶18 John again omits key facts that work against him. First, DMCPS specifically discussed the concerns regarding the paternal grandfather with the parents. The sexual assault allegations were also foundational to a change of placement hearing, at which John was present, objected to the change of placement, and had ample opportunity to hear the full extent of the evidence presented against his father. John continued to believe that the paternal grandfather posed no safety risk to the children, despite hearing the allegations in full.

¶19 We also note that *Jodie W.* does not stand for the proposition that John claims. *Jodie W.* held that a parent could not be found unfit based solely on the fact that the parent was incarcerated. *Id.*, 293 Wis. 2d 530, ¶49. The court did so based on the fact that the parent was being held to a condition that it was impossible for him to fulfill. That is not the same as the present case, where, though it may be difficult for John to fully grasp or understand the extent of the

11

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

allegations against the children's paternal grandfather, it is by no means impossible for John to nevertheless ensure the safety of his children. We therefore reject John's argument on this point.

¶20 Finally, John takes issue with the State's argument that he had failed to provide a "safe and clean home" and focused on his residing temporarily in a camper. He points out that he remained consistently employed as a mechanic throughout the proceedings and, again pointing to *Jodie W.*, argues that a parent's rights cannot be terminated based solely on conditions that are a result of poverty. He argues that DMCPS's "failure to provide meaningful housing assistance, beyond mere referrals to overcapacity shelters, constitutes a failure of reasonable efforts."

¶21 Again, we point out that *Jodie W.* does not stand for the proposition that John claims. While securing a home for a family of eight on a single salary may be difficult, it is not technically impossible. Additionally, John fails to demonstrate what more the agency could have possibly done that would satisfy, in his view, the standard of "reasonable efforts." Farber testified that she directed John and Molly to contact the Department of Housing and Urban Development, and discussed utilizing various shelters with them; however, John and Molly were purportedly not open to utilizing a shelter and stated that they would stay in his truck. The agency was not under an obligation to secure housing for the family.

¶22 We also note that the condition of having a "safe and clean home" is not a condition that could be satisfied simply by securing housing; concerns were raised from the very beginning that the home was in deplorable condition, with a

12

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

strong smell of cat urine throughout the home; trash, toys, and clothing covering the floor; and soiled clothing in the children's room. John ignores these facts, which made up a large part of the State's case on this point.

¶23 Overall, there was a substantial amount of credible evidence to demonstrate to the court that DMCPS had made reasonable efforts to assist John in fulfilling the conditions in the CHIPS dispositional order. His arguments misstate the law and ignore the great body of evidence presented to the court that did not work in his favor. It was not erroneous for the court to conclude that the State had met its burden on this issue.

**II. The circuit court did not erroneously exercise its discretion when it found that the State had proven by clear and convincing evidence that grounds existed to terminate John's parental rights under failure to assume parental responsibility.**

¶24 WISCONSIN STAT. § 48.415(6)(a) states that failure to assume parental responsibility is established "by proving that the parent … [has] not had a substantial parental relationship with the child." A "substantial parental relationship" is defined as "the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Sec. 48.415(6)(b). In determining whether the parent has a substantial parental relationship with the child, the court may consider factors including (but not limited to): (1) "whether the person has expressed concern for or interest in the support, care or well-being of the child"; and (2) "whether the person has neglected or refused to provide care or support for the child." *Id.*

13

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

¶25    John argues that the State failed to prove the ground of failure to assume parental responsibility.  He argues that: (1) the circuit court's "bifurcated" finding was factually and legally inconsistent; (2) the court "over-indexed" on post-removal behavior; (3) the State improperly used medical hearsay to establish a lack of bond between him and the children; and (4) the "mutual desire" order entered by the court created a self-fulfilling prophecy.  We address each of these arguments in turn.

¶26    John first argues that the court's "bifurcated" finding, that the State failed to prove John lacked a substantial parental relationship with the three older children, but succeeded as to the three younger children, was logically flawed.  He asserts that, up until the time of removal in April 2022, all six of the children resided in the same household under his care and financial support.  He argues that there was no evidence presented that he treated or provided more care for the older children than the younger children.  He concludes that, if the court found that his actions in working to support his family, living with his children, and participating in their upbringing, constituted a "substantial relationship" for the older children, it necessarily would have to constitute a "substantial relationship" for the younger children.

¶27    John's logic is flawed; the circuit court found that the State failed to prove that John had failed to assume parental responsibility as to the three oldest children; that is not the same as the court affirmatively finding that John *had* assumed parental responsibility or *had* a substantial parental relationship with those children.  In particular, the court's finding was that there was insufficient evidence, from the time that Ginny was born, until the referral in November 2021,

14

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

to satisfy the clear and convincing evidence standard, stating "we don't really know what their life was like." In contrast, the court noted that the time span from the first referral in November 2021 until disposition would have constituted the majority of the lives of the three younger children, and that there was ample evidence to support a finding that John had failed to assume parental responsibility for them during that time. Because the court never made an affirmative finding that John's actions, in working to support his family financially and living with the children, was sufficient evidence to establish a substantial parental relationship, John's argument on this issue cannot hold water.

¶28 John next argues that the circuit court "over-indexed" on post-removal behavior. He states that the court's finding of unfitness as to the younger children appeared to rely almost exclusively on John's behavior after removal of the children, particularly his lack of engagement at medical appointments and the aforementioned housing situation. John cites to ***Tammy W-G. v. Jacob T.***, 2011 WI 30, 333 Wis. 2d 273, 797 N.W.2d 854, for the proposition that courts must not ignore the period of time a parent *did* live with and support a child. He argues that he "provided the only income for the household during that time," and that his lack of engagement during supervised visits "does not negate the years of daily care and financial provision he provided prior to State intervention."

¶29 John's argument on this point is once again flawed. Nothing in the record indicates that the court ignored the period of time that John and the children resided together, it simply acknowledged that the majority of the evidence came from the time period following the first referral to DMCPS in November 2021. The court based its conclusion, that John had failed to assume parental

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

responsibility for the three younger children, on the conditions that existed in the home prior to and after removal, including that the home was in deplorable condition, with a significant number of animals in the home, that the home smelled of cat urine, and that the children would return to their caregivers with urine-soaked socks and clothing. The court also pointed to the evidence showing that John and Molly would have the older children feed and change the diapers of the younger children, rather than taking care of the children themselves. At no point, during the court's findings of fact and verdict as to the failure to assume ground, did the court even mention John's lack of engagement at visits or medical appointments or the parents' struggles to secure housing. We therefore find that John's argument on this issue lacks merit.

¶30    John next argues that the State improperly used medical hearsay to establish a lack of bond between him and the children, pointing to the testimony of one of the children's foster parents regarding the children's "Complex PTSD" and physical reactions to visits with him. John argues that expert testimony is required for complex medical and psychological diagnoses. He asserts that, by allowing a foster parent—a lay person—to testify that the children's vomiting was a "stress reaction" to him, the court allowed the State to establish a lack of bond through non-expert, anecdotal evidence. He states that, without this testimony, there was little evidence suggesting that the younger children did not have a substantial relationship with him.

¶31    The point in the foster parent's testimony to which John cites does not appear to mention the children's physical reactions to him or any vomiting episodes, as he claims. "[W]e decline to embark on our own search of the record,

16

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

unguided by references and citations to specific testimony, to look for other evidence to support" a party's argument. *Tam v. Luk*, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990). We note that the transcript *does* contain testimony from the foster parent indicating that, at one point, Sybill's clinical diagnosis as given to her by a mental health therapist changed from "PTSD" to "Complex PTSD." The foster parent was then asked to explain her understanding of Complex PTSD as it was explained to her by Sybill's therapist; notably, however, there was no objection made to this line of questioning at trial. "In order to preserve an issue for appeal as a matter of right, a party must object to the error at trial, stating the proper ground for the objection." *State v. Romero*, 147 Wis. 2d 264, 274, 432 N.W.2d 899 (1988). John gives no reason for his failure to object at trial, nor any argument as to why we should overlook that failure. We therefore decline to address this issue any further.

¶32    Finally, John argues that the "mutual desire" order, wherein the circuit court modified visitation with the three older children to be only upon "mutual desire," allowed the State to "terminate the parental relationship by attrition." He implies that the children were influenced by their foster parents in choosing to decline visits with him, and states that this "*de facto*" termination prior to disposition violated his due process rights.

¶33    As an initial matter, we note that the "mutual desire" order to which John refers was entered into *after* the court's finding of unfitness. The hearing on the motion was held on October 14, 2024, whereas the court's findings of fact and verdict took place at a hearing ten days earlier, on October 4, 2024. It is illogical, then, for John to argue that the mutual desire order could have possibly affected

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

the court's decision as to the grounds for termination. In addition, John had the opportunity to object to the mutual visitation order at the time the motion was brought before the court; he did not. He instead chose to stipulate to the order after reviewing it with his attorneys, and for him to now claim that it somehow deprived him of his due process rights is, in our opinion, disingenuous and improper.

**III. The court did not erroneously exercise its discretion when it found that termination was in the children's best interests**.

¶34 The decision to terminate a parent's rights is within the circuit court's discretion. *Gerald O. v. Cindy R.*, 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996). We review the circuit court's determination for an erroneous exercise of discretion. *See **Rock Cnty. DSS v. K.K.***, 162 Wis. 2d 431, 441, 469 N.W.2d 881 (Ct. App. 1991). The circuit court's findings of fact will not be set aside unless they go against the great weight of the evidence. *Onalaska Elec. Heating, Inc. v. Schaller*, 94 Wis. 2d 493, 501, 288 N.W.2d 829 (1980).

¶35 The best interests of the child is the standard at disposition, WIS. STAT. § 48.426(2), and in making its determination the circuit court looks to the factors set out in § 48.426(3). Those factors include (but the court is not limited to): (1) "[t]he likelihood of the child's adoption after termination"; (2) "[t]he age and health of the child," both at the time of disposition and at the time of removal; (3) "[w]hether the child has substantial relationships with the parent or other family members," and whether severance of those relationships would be harmful to the child; (4) "[t]he wishes of the child"; (5) the duration of the separation between the parent and child; and (6) whether the child would be able to enter into

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

a more stable and permanent family relationship should the parental rights be terminated. *Id.*

¶36    John argues that terminating his parental rights was an erroneous exercise of discretion.  He asserts that: (1) the circuit court failed to adequately consider the substantial relationship he had with the three older children; (2) the court erroneously dismissed the impact of socioeconomic hardship as a lack of effort on his part; (3) the evidence of "harm" to the children was based on unfair and speculative lay testimony; (4) the failure to reschedule his psychological evaluation left the court with an incomplete record; and (5) the court underestimated the importance of sibling and extended familial bonds.  We address each argument in turn.

¶37    John first argues that the circuit court failed to adequately consider his substantial relationship with the three older children.  He asserts that "the court's own findings during the grounds phase created a paradox that was never reconciled at disposition," pointing out that, as to the three older children, the court found that he had maintained a substantial parental relationship with them. John again points to the fact that he was the sole financial provider for the family for years and that he lived with the children from the time they were born.  He argues that, to find that a "substantial relationship" exists for the purpose of finding parental unfitness but then determine that the same relationship carries little weight at disposition demonstrates that the court failed to give "adequate weight" to this factor.

19

Nos.  2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

¶38    We have already thoroughly addressed this issue earlier in this opinion.  We again point out that the circuit court at no point made an affirmative finding that John *had* a substantial relationship with his three older children.  The circuit court cannot be faulted for failing to consider a fact that was never found to have existed in first place.  In addition, the record indicates that the court properly considered the factors enumerated in WIS. STAT. § 48.426(3), including whether *the child* had substantial relationships with the parent or other family members, and whether severance of those relationships would have been harmful to *the child*.  Here, the court found that the three younger children did not "have really much of a relationship whatsoever with either parent," and certainly not a substantial one.  It pointed out that the three younger children had not had any visits with John for eleven months prior to the dispositional hearing, and it therefore concluded that it would not be harmful to them to sever the legal bonds between them and John.

¶39    As to the three older children, the court noted that, because of their ages, they were old enough to remember the time period where they lived with John and Molly; however, the court also found that the children had "really settled into a routine" and formed a bond with their foster parent.  The court considered the fact that the children had not requested any visits with John and Molly since the mutual desire visitation order had been put into place.  The court ultimately found that, while the three older children had, at one point, had a bond with John, the statute asks whether the children *presently* had a substantial relationship with the parent, and based on the evidence presented, the court found that they did not have a substantial relationship with either parent.  This was properly within the

20

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

court's consideration under WIS. STAT. § 48.426(3). Additionally, John fails to make the logical connection between his providing financial support to the children for the first few years of their lives and those children having a substantial relationship with him, and we therefore reject his argument on this issue.

¶40     John also points again to the "mutual desire" visitation order, arguing that it exacerbated the harm of severance, as it allowed the children to dictate whether they saw him during the pendency of the case. He insists that the court's determination, that it was in the children's best interests for his parental rights to be terminated, "is a penalty for a parent's inability to overcome the immense psychological pressure placed on children in a foster-to-adopt environment."

¶41     Though we have already discussed it herein, it bears repeating that John, after discussing it with his attorneys, stipulated to the entry of the mutual visitation order. In addition, we point out that the order by no means blanketly prohibited visitation with the children; it restricted visitation to be upon mutual desire between John and the children. The order did not unconditionally prevent John from visiting the children or maintaining a relationship with them. Further, John's assertion that the foster-to-adopt environment placed "immense psychological pressure" on the children has no evidentiary basis. We therefore reject John's argument on this issue as well.

¶42     John next argues that the circuit court erroneously dismissed the impact of socioeconomic hardship as a lack of effort on his part, with the court particularly focusing on his failure to secure housing for the family. He insists

21

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

that the record "is replete with facts that favor [his] industriousness," pointing out that he remained consistently employed as a mechanic, working to support his children. Again pointing to *Jodie W.*, John argues that his failure to secure housing cannot be the sole basis for termination. He asserts that the court should have considered whether his consistent employment within a specialized trade represented a "protective factor" that could be leveraged with proper agency support.

¶43 The evidence presented to the court at disposition was that John and Molly were, at the time, residing in a camper at State Fair Park with six cats and one dog. The only comment that the circuit court made as to that testimony was noting that John and Molly "[had] not remedied the housing situation." John's argument, that the court improperly focused on the housing situation, mischaracterizes the testimony and the court's decision. Further, John gives no legal authority for the proposition that his consistent employment and specialized trade as an auto mechanic should have "represented a 'protective factor' that could be leveraged with proper agency support." We may decline to review issues that are inadequately briefed or unsupported by references to legal authority. *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). We therefore reject John's argument on this issue as well.

¶44 John next argues that the evidence of "harm" to the children, on which the court relied in making its determination, was based on unfair and speculative lay testimony. He points specifically to testimony that Katie and Nick vomited after contact with him, and argues that the court "failed to consider the countervailing fact that these children were removed at ages … where they were

22

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

highly susceptible to the influence and anxieties of their caregivers." John repeats his prior argument, that the medicalized testimony from the foster parents was improper, as it was "provided by a foster parent with a vested interest in adoption." He insists that the court failed to consider that he had successfully cared for the children for years without similar "physical stress reactions," and that this suggests that the reported reactions were "situational to the foster care environment, not inherent to [his] parenting."

¶45 Again, we point out that John did not make any contemporaneous objection at the time the testimony to which he cites was given. *See Romero*, 147 Wis. 2d at 274. John again implies that the children's caregivers put psychological or emotional pressure on the children, without providing any evidentiary basis for those implications. We do not believe this argument merits any further consideration, as we have thoroughly addressed these issues already herein. *See Pettit*, 171 Wis. 2d at 646.

¶46 John next argues that the failure to reschedule his psychological evaluation left the court with an incomplete record. He points out that Farber herself testified that John had struggled in school and that, while he had driven his wife to her evaluation, he missed his own due to weather. John argues that the court's decision to terminate his parental rights without having a full understanding of his cognitive abilities was an abuse of discretion. He concludes that, if he has a learning disability, his "failure" to understand his children's medical needs was not a lack of interest but due to a lack of capacity that DMCPS failed to properly address.

23

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

¶47     John's connection, between the lack of any psychological evaluation as to his cognitive abilities and the court's decision that termination of his parental rights was in the children's best interests, is strained.  We have already addressed the fact that DMCPS was not required by the court to assist him in completing a psychological evaluation.  In addition, his argument that, if he has a learning disability, his demonstrated lack of understanding of his children's medical needs was not due to a lack of interest but due to his lack of capacity, is not supported by any credible evidence, and is speculative in nature.  We therefore do not address it further.

¶48     Finally, John argues that the circuit court underestimated the importance of sibling and extended familial bonds to the children.  He argues that the separation in this case was exacerbated by DMCPS's refusal to consider the paternal grandparents as a potential placement, again insisting that he was "never fully briefed" as to the extent of the allegations against the grandfather.   John argues that his desire to keep his children with the paternal grandparents was portrayed as him risking his children's safety, and asserts that this should have instead been "viewed as a desire for family continuity."

¶49     The circuit court was under no obligation to view John's desire to allow the children to visit with or live with the paternal grandfather, in spite of the sexual abuse allegations against him, as "a desire for family continuity" rather than a willingness to risk the children's safety.  We also again reject John's argument that he was "never fully briefed" on the full extent of the allegations made against the paternal grandfather, for the reasons stated previously herein.

24

Nos. 2026AP469
2026AP470
2026AP471
2026AP472
2026AP473
2026AP474

**CONCLUSION**

¶50    For the aforementioned reasons, we reject John's arguments and affirm the orders of the circuit court.

*By the Court.*—Orders affirmed.

This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)4.